793 So.2d 1199 (2001)
STATE of Louisiana
v.
Juan A. SMITH.
No. 98-KA-1417.
Supreme Court of Louisiana.
June 29, 2001.
Rehearing Denied August 31, 2001.
*1201 Timothy R. Saviello, Clive Adrian Stafford-Smith, New Orleans, for Applicant.
Richard P. Ieyoub, Attorney General, Harry F. Connick, District Attorney, Karen K. Herman, Roger w. Jordan, Jr., New Orleans, Valentin M. Solino, for Respondent.
CALOGERO, Chief Justice.[*]
Juan A. Smith was indicted by a grand jury for the first degree murders of Devyn Thompson, Tangie Thompson, and Andre White, violations of La.Rev.Stat. 14:30. After trial, the jury found the defendant guilty of three counts of first degree murder, and unanimously voted to impose the death penalty on all three counts. The trial court sentenced the defendant to death. This is a direct appeal from that conviction and sentence. La. Const. art. V, § 5(D)(2); La.Code Crim. Proc. art. 912.1(A). The defendant raises twenty-five assignments of error for reversal of his conviction and sentence.[1] For the reasons set forth below, we affirm the defendant's convictions for first degree murder and the sentence to death.

FACTS
On February 5, 1995, after several attempts to contact his sister Tangie Thompson, Jerome Clayton went to Ms. Thompson's Morrison Road home. Ms. Thompson shared the home with her three-year-old son, Devyn Thompson, and her boyfriend, Andre White. Jerome arrived at the Morrison Road home sometime after 2:00 p.m. After ringing the door bell several times without a response, he decided to walk around to the back of the house to inquire further. Jerome noticed blood on a window and, as he looked into the house, he saw Tangie, Devyn, and Andre lying face down in the den. Immediately thereafter, he reported his findings to the New Orleans Police Department (NOPD).
Upon arrival at Ms. Thompson's home, NOPD Officer James Clarkston and his partner, Darryl Watson, informed Jerome that, if he would break his sister's window, they would go into the house. Upon entering the house, the police officers immediately observed that a bedroom had been ransacked. They then noticed the three bodies face down in a pool of blood in the den area. The police officers secured the crime scene until the homicide detectives and crime lab personnel arrived.
When Homicide Detective Byron Adams arrived at the Morrison Road home, he observed that Tangie, Devyn, and Andre had been struck multiple times by gunshots. Andre was lying face down on one side of the den, while Devyn was lying under his mother, Tangie, who was also lying face down on the opposite side of the den from Andre. Detective Adams counted fourteen shell casings scattered throughout the den area. Four bullets were removed from Tangie's body during her autopsy, one of which was identified as being fired from a 9mm semi-automatic pistol. Three bullets were removed from *1202 Andre's body during his autopsy, two of which were identified as being fired from the same 9mm semi-automatic pistol. Two bullets were removed from the floor under the location where Tangie and Devyn were killed. One of the bullets was identified as being fired from the same 9mm semi-automatic pistol. Additionally, Detective Adams was able to determine that four bullets had passed through the bodies of Tangie and Devyn and into the carpet and linoleum beneath them. The ballistics test later revealed that all of the 9mm bullets were fired from a Ruger model P89DC, 9mm semi-automatic pistol and that only bullets fired from that Ruger, 9mm semi-automatic pistol caused damage at the Morrison Road residence.
Initially, the police investigation centered around Benny Thompson, Tangie's ex-husband and Devyn's father. The press identified Benny Thompson as a suspect in the murders. The case received immediate national publicity because Thompson was an active NFL football player and a former New Orleans Saint. The murders went unsolved for several months. On May 6, 1995, the NOPD arrested Robert Trackling, Donielle Bannister, and Romalis McGee for an unrelated incident.[2] During an automobile chase that led to the arrest of Bannister and Trackling, Bannister threw a 9mm Ruger handgun from the window of the car in which he was fleeing. Ballistics tests later revealed that this weapon was the same weapon used in the Morrison Road murders. While in jail on the unrelated charges, Trackling made inculpatory statements concerning the Morrison Road murders to his cell mate, Eric Rogers. Rogers passed on the information to jail authorities. Based on this information, the police interviewed Trackling with respect to the instant case. He then gave a statement implicating himself, the defendant, Bannister, and Kintad Phillips. Trackling also testified against the defendant at trial.
In February 1995, Bannister and Phillips contacted Trackling for help in a proposed robbery attempt. They told Trackling that all they needed was for him to drive the car, and that they would be robbing someone with a lot of money. Trackling agreed and proceeded to pick up Bannister and Phillips. At that time, he learned that a fourth man, Juan Smith, the defendant in this case, was already involved in the planned robbery attempt. The three went to pick up Smith. Trackling testified that, when the three left Phillip's house, Bannister was armed with an AK-47 assault rifle and a 9mm handgun and that Phillips was also armed with an AK-47.
Trackling stated that the three then drove in his car to the St. Roch playground in New Orleans where they picked up the defendant, Juan Smith, also known as "Short Dog." The defendant, who apparently had earlier communicated with Bannister about robbing Andre White, then directed Trackling to the house on Morrison Road where the defendant thought they would find Andre. The defendant informed the group that Andre was known to possess a large sum of money and narcotics. At that time, Phillips was armed with an AK-47, as was Bannister, and the defendant armed himself with a 9mm semi-automatic pistol given to him by Banister. *1203 After discovering that no one was at the residence on Morrison Road, the foursome left the area, and defendant directed Trackling to drive to Andre White's place of business on Elysian Fields Avenue. Once there, the defendant did not see Andre's car, so the defendant ordered Trackling to drive back to the Morrison Road house. As they approached the Morrison Road residence, a light came on in the house. At that time, Andre and young Devyn were seen walking down the driveway. Bannister jumped out of the vehicle and held Andre at gunpoint with the AK-47. The defendant, Smith, and Phillips then exited the car. Phillips was armed with an AK-47, and the defendant was still armed with the handgun. Smith and Bannister led Andre into the house through an entrance from the garage. Phillips grabbed the child and also entered the house. Smith hit the garage door button, and the door closed.
According to Tracking's testimony, he remained in the car, but pulled off to the side of the road so as not to attract attention. He waited approximately twenty to thirty minutes until he saw a light come on. He then saw a Toyota 4-Runner backing out of the driveway with Phillips at the wheel. As Phillips backed out, Trackling heard gunshots that sounded to him as if they had been fired from a handgun. Immediately following the gunshots, Bannister and Smith ran out of the house from the garage. The defendant had the 9mm handgun in his hand, while Bannister held the AK-47. Defendant hit the garage button to close the door. Then he and Bannister jumped into the 4-Runner, and both cars left the scene. A few blocks later, while traveling on Crowder Road, the 4-Runner signaled Trackling to pull over. The defendant, Bannister, and Phillips exited the 4-Runner, leaving the keys in the ignition, and entered Trackling's car. The defendant then asked Bannister if he had seen the "dude's head" when he, the defendant Smith, shot "the dude." Trackling also testified that Bannister seemed annoyed that the defendant had shot the woman and the child more times than defendant had shot the man and that they had failed to secure any money from the house. Trackling then dropped the defendant off at his girlfriend's house, but before he got out of the car the defendant gave the 9mm handgun back to Bannister. Trackling then drove Bannister and Phillips back to the St. Thomas project.
Several days later, Trackling testified, the four co-defendants again met at the St. Roch playground to discuss media coverage of the murders. The group laughed at the newspaper's report that the murders had been a professional job and that Benny Thompson, Tangie Thompson's ex-husband, was suspected of having been implicated in the crime.

DISCUSSION
Defendant has filed twenty-five assignments of error, contending that his conviction and sentence should be reversed. We will consider all of the assignments urged by defendant. Three of the assignments merit discussion in this published opinion. The others will be discussed in an unpublished appendix.

GUILT PHASE

Assignment of Error No. Five
In his fifth assignment of error, the defendant claims the state improperly bolstered Robert Trackling's testimony by urging jurors in closing argument to consider prior inconsistent statements made by Trenice Dordon and Trenice Smith as substantive evidence of the defendant's inculpatory admissions to them of his involvement in the murders. Specifically, the defendant argues that, when the state called both women to testify, they acknowledged making prior statements but they made it clear that the statements were not *1204 true. Thereafter, the defendant contends, the State used the witnesses' prior statements to impeach their testimony, then impermissibly argued the substance of the prior statements in its closing and rebuttal arguments in violation of Louisiana's long-standing rule that prior inconsistent statements made by a witness are not admissible for their substantive, assertive content. See State v. Cousin, 96-2973, p. 8 (La.4/14/98), 710 So.2d 1065, 1069
The State called as its witness Trenice Dordon, the defendant's girlfriend, to establish that several days after the murders, and prompted by a news report about the crime, the defendant confided to her on two occasions that "that was cold" and "we did that." Dordon had given a statement to that effect to the police and repeated its substance in a deposition taken by the prosecutor in the District Attorney's Office. Although called as a State witness, Dordon testified at trial that, while she may have given those statements to the police and to the prosecutor, her conversation with the defendant had, in fact, never taken place. Under cross-examination by the prosecutor, Dordon acknowledged that she did not want to testify in court and did so only under compulsion of a subpoena issued by the state. She then entered into the following exchange with the prosecutor:
Q. Do you remember stating [in the deposition] that you had a second conversation with Juan Smith about that same subject?
A. Yes.
Q. You asked him again about that?
A. Yes.
Q. And he said the same thing to you, "We did that"?
A. Yes.
Q. So he said it to you twice, didn't he?
A. Yes.
Similarly, when the state called Trenice Smith, the defendant's sister, to the stand, the witness told jurors that in a conversation that took place sometime in February of 1995 the defendant had confided to her, "Man, I should have went to Florida with my boy." However, when Smith denied that the defendant said anything else in this conversation, the prosecutor confronted her with a prior deposition she also had given him in the District Attorney's Office, in which she recounted that the defendant made several other statements about the circumstances under which Devyn Thompson and Andre White were killed. The following exchange occurred during this cross-examination:
Q. Okay, ma'am, let me refer now to July 15 when I asked the question: "Did he say anything about the name Andre White?" Remember when I asked you that question ...?
A. He said somebody called his name.
Q. Tell me about that. What do you mean "somebody called his name."
A. Called Andre White's name.
Q. When?
A. I don't know.
Q. Do you remember saying what Andre White did when his name was called out?
A. Said he turned around.
Q. Who turned around?
A. Andre White.
Q. And then what?
A. He looked surprised.
Q. And your brother said this to you, correct?
A. Yes. ...
Q. I'm going to refer you first to your answer when I asked you: "Did he say anything else about [why he shot the baby]? I'm referring to page 7, line 8 [of the deposition]. Why did he say he shot [the child]? Line 8.

*1205 A. He might identify him.
Q. He might identify him?
A. Yes.
Q. And your brother said this to you?
A. Yes.
Q. You don't want to be here today, do you?
A. I didn't have a choice.
Q. And it's difficult for you to testify today, correct?
A. Yes, because that's my brother.
The defendant not objects to several arguments made by the state during its guilt phase closing argument. First, the prosecution argued:
Trenice Dordon, Juan's girlfriend, she told the police and she told Roger Jordan that one night in February she's watching the news and the story comes on about these murders. And she says something to the effect that whoever did that was cold. And Juan tells her, "We did that." Do you really think she was thrilled about coming to testify? You judge a person's demeanor by how they act on the stand and what they say what they don't want to say. How they act when they're asked questions that they don't want to answer.
"We did that. I should have gone to Florida with my boy." Corroboration. Nothing to do with Robert Trackling.
* * * *
Trenice Smith, Juan's sister, also not thrilled about testifying ... What else did she tell you? "We did that." The most significant thing that she told you wasJuan Smith told his sister, "I called out "Andre." Andre turned his head and looked surprised." Think about that. He knew exactly what he was doing. He also told you one more thing. "I killed the little boy because he could ID me. He was walking and he was talking."
R. Vol. 3, pp. 284-285.
Next, in his rebuttal argument, District Attorney Jordon argued:
Because Juan Smith killed Devyn Thompson and Tangie Thompson and Andre White, because he killed every single person in that house who could identify him, including the little baby that was walking and talking
DEFENSE: I object.
COURT: Objection sustained.
* * * *
Trenice Dardon [sic] and Trenice Smith, corroboration of his testimony. They didn't want to come. They didn't want to testify. Trenice Dardon [sic] took that stand and she said, `I said that was cold and he said it was cold, too." Right. And when she was impeached with her former testimony that she gave to the police officers, former testimony that she gave to the district attorney's office, in this building, a sworn statement, "Yeah, I said that he said, "We did that." "And did he say that to you a second time?" She didn't have to be impeached about that second statement. Do you remember that? She said yeah, he said `We did that.'" ... And Trenice Smith testified. And she's a sister of the defendant. And when the intent of somebody is to kill every single person that's inside that house, the only persons we're left with are the people that drive them there. The only people we're going to be left with are his girlfriend, his sister 
DEFENSE: I object and ask that he argue to the jury, Your Honor.

*1206 COURT: Mr. Jordan, argue to the jury, not to the defendant. Argue to the jury.
So his sister testifies. She testified that he said, number one, his boy went to Florida. He should have gone to Florida with his boy ... His sister and his girlfriend. Corroboration. Tell that to the other jurors if you remember that.
And what else did she say he said? That he called out the name Andre White. "Do you remember, ma'am, what he said? Do you know the name Andre White?" "Yes, he called out the name Andre White." It was in her testimony. She read it to you. He called out the name and the man looked around and looked surprised. Corroboration of what Trackling says. And this statement that's given by Juan Smith to his sister before Trackling's ever found, before Trackling's ever arrested. Before he ever makes a statement to Eric Rogers of the police department.
And why did he kill the baby? Why did he kill the baby? Because he could identify him. "Because he was walking and talking. That's why I killed the baby." A three-year-old child he killed because he could possibly identify him. And that's why you have Robert Trackling testifying, Trenice Smith testifying, and Trenice Dardon [sic] testifying because his intent was to kill everybody in that house.
* * * *
And it's important, important that Trenice Dardon [sic] was given a statement also by Juan Smith. She said that he said, "We did it."
From the outset, the State argues that the defendant is procedurally barred from raising this assignment of error because the defendant's trial counsel failed to lodge a contemporaneous objection during the State's closing argument. Additionally, the State argues that under intense cross-examination, and despite their attempts to disavow their prior statements, both witnesses ultimately conceded that, in fact, the defendant had made the damning admissions to them. That testimony, the State argues, provided jurors with direct substantive evidence of the defendant's admissions, which the jurors could consider apart from any impeachment value the witnesses' testimony may have had, as the witnesses' testimony changed between the time they were interviewed by the police and prosecutor and their testifying at trial.
In State v. Taylor, 93-2201 (La.2/28/96), 669 So.2d 364, this Court, in a unanimous decision, clarified its prior jurisprudence regarding the application of Louisiana's contemporaneous objection rule. We held in Taylor that "[t]his Court's scope of review in capital cases will be limited to alleged errors occurring during the guilt phase that are contemporaneously objected to, and alleged errors occurring during the sentencing phase, whether objected to or not." Id., 93-2201, p. 7, 669 So.2d at 369. Taylor therefore explicitly overruled this Court's decision in State v. Smith, 554 So.2d 676, 678 (La.1989), which had held that this Court possessed the authority under its Rule 28 to correct substantial errors occurring in the guilt or sentencing phases of a capital trial despite the lack of a contemporaneous objection. In State v. Wessinger, 98-1234, p. 20 (La.5/28/99), 736 So.2d 162, 181, another unanimous decision, this Court extended the contemporaneous objection rule to the penalty phase of a capital case. We gave that rule prospective effect only and left open the possibility that, in the Court's independent review of capital sentencing hearings under La. Sup.Ct. Rule. 28 and La.Code Crim. Proc. art. 905.9, an error serious enough to warrant reversal "will be discovered during our mandatory direct review" without *1207 regard to whether a contemporaneous objection was lodged in the trial court. Id. Finally, in State v. Thibodeaux, 98-1673, p. 15 (La.9/8/99), 750 So.2d 916, 928, we further refined our review of sentencing phase errors in capital cases by holding that, for those errors not barred from review by Wessinger because of the lack of a contemporaneous objection, the defendant must show not only that an error occurred, but also that it was of "such magnitude that it undermines confidence in the jury's sentencing verdict."
In the present case, we agree with the State that Taylor bars review of the defendant's claim. At no time during the prosecutor's closing or rebuttal argument did counsel object that the State was improperly vouching for the truth of the prior inconsistent statements made by Trenice Dordon and Trenice Smith. Applied in any case, the contemporaneous objection rule "prevent[s] a defendant from gambling for a favorable verdict and then resorting to appeal on errors that might easily have been corrected by objection." State v. Thomas, 427 So.2d 428, 433 (La.1982)(on reh'g) (citations omitted)
Moreover, the circumstances in this case are not such that we are inclined to revisit Taylor and yet again refine our rules governing procedural defaults in capital cases. Cousin reaffirmed a long-standing rule in Louisiana that evidence of a witness's prior inconsistent statement is admissible solely to impeach the witness's credibility and not as substantive evidence of the defendant's guilt. Cousin, 96-2973, p. 8, 710 So.2d at 1069 ("Although such evidence is admissible for impeachment, this Court has steadfastly recognized that when a witness other than the defendant is impeached by the admission of a prior inconsistent statement incriminating the defendant, the statement is admissible only on the issue of credibility and not as substantive evidence of the defendant's guilt.")(internal quotation marks and citations omitted). This rule dates back to 1897 in Louisiana. State v. Ray, 259 La. 105, 249 So.2d 540, 542 (1971).
The transcript of closing and rebuttal arguments in the present case does suggest that the State may have invited the jury to consider the prior inconsistent statements of both witnesses as corroborative evidence bolstering Trackling's damning testimony. On the other hand, we cannot discount on the basis of the cold record the State's argument here that, under the prosecutor's probing cross-examination, both witnesses were ultimately referring not to their prior depositions, which the prosecutor had in hand as he questioned them, but to the statements made by the defendant, when they admitted essentially that, "Yes, he said that." In this latter scenario, the State is correct that this testimony from the stand constituted direct evidence of the defendant's admissions, which the jury was entitled to consider along with Trackling's testimony implicating the defendant in the murders. The prosecutor clearly thought he had wrested this direct testimony from Trenice Dordon, as he argued to jurors that he did not even have to impeach the witness with regard to the second conversation that allegedly took place with the defendant because she had (at the last) admitted on the stand that the conversation had taken place. For all that appears on the present record, defense counsel did not object because he, too, believed that the witness ultimately succumbed to the prosecutor's cross-examination and confessed to what she had been attempting to avoid by disavowing her prior statements. See Taylor, 93-2201, p. 22, n. 10, 669 So.2d at 375-376, n. 10 ("[T]he lack of an objection demonstrates the defense counsels' belief that the live argument, despite its appearance in the cold record, was not overly damaging.").
*1208 Given the ambiguity in the present record, we cannot discount the reasonable possibility that the jurors, who had the benefit of observing the witnesses as they testified, may have assessed the testimony in this manner. Under these circumstances, we do not find as a basis for excusing the lack of objection that, with direct substantive evidence of defendant's admissions in evidence, the prosecutor's additional improper vouching for the truth of the prior inconsistent out-of-court statements rendered the trial fundamentally unfair or undermined the confidence of this Court in the jury's verdict. Thibodeaux, supra.
Accordingly, because Taylor bars review of the defendant's claim for lack of a contemporaneous objection, and for the additional reasons stated above, we find this assignment of error lacks merit.

PENALTY PHASE

Assignment of Error No. Twelve
In this assignment of error, the defendant contends the State improperly introduced documentary evidence and testimony about the defendant's prior conviction at the penalty phase. First, the defendant argues the State introduced "an extraordinary amount" of evidence regarding the defendant's prior murder conviction. The defendant also claims that Detective Ronquillo's testimony concerning the prior convictions prejudiced the jury and injected an arbitrary factor into the penalty phase. Specifically, the defendant points to the fact that, of the twenty-six pages of testimony introduced in the State's case-in-chief in the penalty phase, twenty-two (or eighty-five per cent) consisted of testimony regarding the defendant's prior conviction, while fifteen of those twenty-two pages of testimony came from Detective Ronquillo.
The State counters that Detective Ronquillo's testimony was properly admitted because his testimony was probative to establish the defendant's propensity to kill execution-style, citing State v. Comeaux, 93-2729 (La.7/1/97), 699 So.2d 16. Additionally, the State argues that the references to the 9mm and AK-47 shell casings were probative as establishing that those types of weapons were the defendant's weapons of choice, again citing Comeaux, supra. Finally, the State argues that the testimony was probative of, and necessary to establish, the aggravating circumstance that the defendant was previously convicted of an unrelated murder.
The defendant did not lodge an objection to Detective Ronquillo testifying during the sentencing hearing. However, because the error occurred in a pre-Wessinger penalty phase of a capital case,[3] such a failure does not prevent this Court from reviewing errors raised for the first time on appeal. State v. Taylor, 93-2201, p. 21 (La.2/28/96), 669 So.2d 364, 375.
It is well-settled that the State is entitled to introduce evidence of a capital defendant's unrelated convictions at the penalty phase as reflective of his character and propensities. State v. Jackson, 608 So.2d 949, 953-54 (La.1992); State v. Hamilton, 478 So.2d 123 (La.1985); State v. Sawyer, 422 So.2d 95, 104 (La.1982). Evidence of the defendant's prior convictions of murder, which are unrelated to the murders for which the defendant was convicted in the instant case, is especially so *1209 probative, and is certainly useful for the jury in evaluating and performing its awesome task of deciding whether or not to recommend execution. Jackson, 608 So.2d at 954. However, as this Court has stated before, there can be a point when the sheer magnitude and detail of the evidence, although highly probative, impermissibly shifts the jury's focus away from its primary function of determining the appropriate sentence for this offense and this offender. Comeaux, pp. 10-11, 699 So.2d at 22. In fact, this Court in Jackson specifically limited "the evidence supporting a prior conviction to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." Jackson at 954.
This Court addressed the issue of whether a police officer is able give testimony concerning a defendant's prior conviction during the penalty phase of a trial in State v. Williams, 96-1023, pp. 19-21 (La.1/21/98), 708 So.2d 703, 719-20. The Court held that, when the trial court allowed the police officer to testify during the penalty phase of the trial, it technically violated the rule set out in Jackson. However, after reviewing the record, we held that the police officer's testimony did not inject an arbitrary factor into the jury deliberations. Williams, p. 43, 708 So.2d at 719.
After reviewing the record in this case, we are not able to say that the testimony and evidence presented by Detective Ronquillo did not inject an arbitrary factor into the jury deliberations, as was held in Williams. "Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed `wantonly or freakishly' or for discriminatory reasons." Thibodeaux, p. 14, 750 So.2d at 928.
In this case, Detective Ronquillo testified at some length describing the location of the murders and what he saw upon his arrival, describing in detail where the murder victims were situated in the house, describing the number of gunshot wounds each victim sustained, describing the types of weapons used in the murders and accounting for the numerous shell casings found at the scene, and stating he had "never experienced a scene like that with so many people that had been butchered." Additionally, the prosecutor was able to introduce through Detective Ronquillo's testimony photographs of the North Roman Street murders, State's Penalty Phase Exhibits 2 through 19.[4] Finally, Detective Ronquillo was allowed to illustrate to the jury, through the use of State's Penalty Phase Exhibits 20 and 21, a crime scene sketch prepared the night of the murders, to further illustrate the exact locations of the victims and reiterate the aforementioned testimony describing the names of the victims, the locations of the victims in the residence, and the number of gunshots each victim had sustained. Nonetheless, it was permissible for the State to show that the defendant, Juan Smith, had been convicted of the five North Roman Street murders that were unrelated to the murders of the three victims in this case, Tangie Thompson, Devyn Thompson, and Andre White.
The reasoning behind limiting the evidence regarding prior convictions during the penalty phase "to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime" is to allow the jury to *1210 consider the fact that the defendant had been previously convicted of the crime of murder without shifting the jury's focus from its function of determining the appropriate sentence in the case at hand to a focus on the defendant's involvement in another unrelated crime. It is the shifting of the focus of the jury to an unrelated crime that creates the injection of an arbitrary factor, which explains why we have placed limitations on the evidence admissible to support a prior conviction.
Allowing Detective Ronquillo to testify during the penalty phase violated our rule regarding what information is admissible to establish the fact of prior convictions. See Jackson, supra; Williams, supra. Additionally, Detective Ronquillo's testimony injected an arbitrary factor. Yet, because the defendant failed to object at the penalty phase to this evidence, the existence of an arbitrary factor requires this Court to find the error of such magnitude that it undermines confidence in the jury's sentencing verdict before we can reverse the defendant's sentence. See Thibodeaux, p. 15, 750 So.2d at 928.
Although it was error to allow the jury to hear the testimony of Detective Ronquillo regarding the defendant's involvement in the unrelated North Roman Street murders, we cannot say that such testimony undermines our confidence in the jury's death penalty verdict. The jury had just convicted the defendant of the murders of Devyn Thompson, Tangie Thompson, and Andre White, and they were entitled, at the least, to consider that the defendant had earlier been convicted of five counts of murder. They were presented evidence in this case that the defendant shot three-year-old Devyn Thompson multiple times while he lay face down under his mother, Tangie, who was also shot multiple times as she lay face down. Additionally, the evidence in the instant case presented to the jury portrayed the defendant as a cold-blooded killer who had just killed the three victims at close range, at most eighteen inches from the body, arguably execution-style.
Accordingly, although the trial court erred in allowing Detective Ronquillo to testify, there was no contemporaneous objection, and the error does not undermine confidence in the jury's sentencing verdict. Therefore, this assignment of error is without merit.

Assignment of Error No. 13
The defendant next asserts the jury was given inadmissible and highly prejudicial information about him during the penalty phase when the State misrepresented to the court and to defense counsel the contents of State's Penalty Phase Exhibit No. 22, the certified copy of the defendant's previous convictions.
According to the defendant, the State represented that the exhibit contained only a certified copy of the conviction of Juan Smith for five counts of first degree murder. However, the defendant demonstrated to the trial court that the exhibit actually contained the five-count indictment, the five verdict forms with guilty written on each form, four pages of minute entries, the docket master, and the arrest register pertaining to the defendants July 9, 1995 arrest, which included his FBI number and "CAREER CRIMINAL" stamped on the document.
When questioned by the trial court whether the State had looked at the documents certifying the defendant's prior convictions before giving them to the jury, the prosecutor indicated that he had not. The prosecutor informed the court that he had requested the documents two weeks before, but had only received them that day after his closing argument and did not review them prior to giving them to the jury. The trial court accepted this explanation, believing it had been an inadvertent *1211 mistake that the jury received those documents. We cannot say that the district court erred in his assessment.
The defendant also argues that, even if the evidence was unintentionally given to the jury, the trial court's refusal to grant a mistrial was reversible error. Although defendant is correct in asserting that evidence that references an accused's commission of other crimes may result in prejudice to his substantial rights sufficient to undermine the fairness of trial, the trial court is charged with assessing the prejudice, and it is within the trial court's sound discretion to decide whether to grant or deny a mistrial. State v. Edwards, 97-1797, pp. 19-20 (La.7/2/99), 750 So.2d 893, 905-906; State v. Connolly, 96-1680, p. 23 (La.7/1/97), 700 So.2d 810, 824. Even though Art. 770(2) is couched in mandatory terms (a "mistrial shall be ordered...."), the admission of other crimes evidence, as stated above, is subject to harmless error analysis. State v. Johnson, 94-1379, pp. 16-17 (La.11/27/95), 664 So.2d 94, 101-02. Therefore, it must be determined "whether there is a reasonable possibility that the evidence complained of might have contributed to the [sentence]," and whether "the court [can] ... declare that [the error] was harmless beyond a reasonable doubt." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).
Despite the defendant's best efforts to make this error appear egregious, he ignores the fact that the jury had already received evidence that he had been convicted of the five murders on North Roman Street. Moreover, although the document did contain a colored stamp declaring the defendant a "career criminal," in light of the fact that the jury had just heard of his direct participation in no less than eight murders, this could hardly be seen as any significant prejudice by having this judgmental label of defendant before the jury.
Counsel also contends the error was amplified when the prosecutor argued the defendant was a "career criminal" during his closing argument. However, a review of the record reveals that the prosecutor did not refer to the defendant as a "career criminal." Instead, the prosecutor simply argued as follows:
The second consideration is whether or not Juan Smith has any prior criminal history. Does he have any prior criminal history, any significant prior criminal history. He's been convicted of the ultimate crime in this very court room a year ago. Convicted of the ultimate crime that he committed less than a month after he shot a little three-year old baby and his mama and someone else in the same room. He's been convicted of five counts of first degree murder. Is that significant criminal history?
As discussed above, evidence of the defendant's convictions for five murders in addition to the three with which he was charged in the instant case was already before the jury when they viewed the inadmissible evidence. Moreover, in light of the facts surrounding the crime for which the jury had just convicted the defendant, including the fact that a three-year-old child had been shot no less than eight times, it is highly unlikely that these documents, beyond simply the certified copies of the convictions contributed to the sentence. Accordingly, any error in admitting the "certified conviction packet," which included the arrest record and docket master, was harmless error under Chapman, supra.

CAPITAL SENTENCE REVIEW
Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. Rule 28, this Court reviews every sentence of death imposed *1212 by the courts of this state to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender. In the instant case, the trial court, has submitted a Uniform Capital Sentence Report ("UCSR"), and the Department of Public Safety and Corrections ("DOC") has submitted a Capital Sentence Investigation ("CSI"). The State also submitted a Sentence Review Memorandum.
The CSI indicates the defendant is an African American male born on August 28, 1974. He was twenty-two years old at the time of the offenses. The defendant is the third of five children. He resided with his parents in the Fischer Housing Project until he was eleven years old at which time his parents separated and he moved to the Seventh Ward with his mother.
As for his educational and work background, the defendant quit school in the seventh grade after he was expelled for fighting. The defendant then started stealing bikes and was sent to the Louisiana Training Institute. While incarcerated there, the defendant's IQ was tested at 99 and he received his General Equivalency Diploma. His work history is nonexistent as the defendant apparently supported himself by the sale of crack cocaine.
When questioned about drug and alcohol use, the defendant admitted marijuana use but denied ever using cocaine. The CSI also reveals that the defendant is classified as a first felony offender, although he had a fairly lengthy juvenile record including numerous arrests for possession of stolen property. His adult record shows convictions for five murders besides the three murders for which he was convicted in this case.

Passion, Prejudice, and other Arbitrary Factors
The defendant contends that a number of elements introduced passion, prejudice, and other arbitrary factors in the penalty phase. First, the defendant claims the trial court erred in allowing the State to introduce excessive amounts of other crimes evidence in the penalty phase. The defendant further argues the error was compounded by the prosecutor's arguments inviting the jury to impose the death penalty based on the defendant's prior crimes and that the trial court erroneously admitted highly prejudicial material into evidence, allowing the jury to view documents that referred to him as a "Career Criminal,"and that this error injected prejudice in the penalty phase. Finally, the defendant argues that these errors were compounded by the State's improper argument during the penalty phase and by erroneous jury instructions given by the court. These arguments have been fully addressed above, except for the argument alleging that the trial court gave erroneous jury instructions, which is discussed in the appendix, and found to lack merit. No other prejudice is perceived.

Aggravating Circumstances
The defendant was indicted by grand jury and charged with committing three counts of first degree murder, the State filed a notice of intent to rely on the following aggravating circumstances at the sentencing hearing: 1) the defendant knowingly created a risk of death or great bodily harm to more than one person, La. Code Crim. Proc. art. 905.4(A)(4); 2) the offense was committed in an especially heinous, atrocious, or cruel manner, La.Code Crim. Proc. art. 905.4(A)(7); 3) the defendant was engaged in the perpetration or attempted perpetration of an armed robbery *1213 and aggravated burglary, La.Code Crim. Proc. art. 905.4(A)(1); and with respect to victim Devyn Thompson, 4) the victim was a person under the age of twelve. La.Code Crim. Proc. art. 905.4(A)(10). Notably, the State did not list in its notice one of the aggravating circumstances returned by the jury: that the offender has been previously convicted of an unrelated murder. La.Code Crim. Proc. art. 905.4(3). However, the State did file a notice of intent to use evidence of the defendant's other crimes at the sentencing hearing, particularly his convictions for five counts of first degree murder. Although the defendant must have adequate prior notice of the State's intent to introduce evidence of his past misconduct in the penalty phase, there are no formal requirements for such notice. When, as in the instant case, another motion by the State made clear that it would rely on the defendant's prior criminal record as an aggravating circumstance, and counsel's opening remarks to the jury at sentencing showed clearly that he anticipated the State's evidence of the defendant's prior record, no prejudice to the defendant occurs, and the failure to file a formal notice does not warrant vacating the death penalty. State v. Ward, 483 So.2d 578, 585 (La.1986).
The jury found the existence of all the aggravating circumstances urged by the State, including the aggravating circumstance of heinousness with respect to all three murders. However, the evidence failed to support that any of the murders were "committed in an especially heinous, atrocious, or cruel manner." Nevertheless, the inclusion of this aggravating circumstance did not interject an arbitrary factor into the proceedings because evidence of the manner in which the offenses were committed and of the nature of the victims' injuries was all relevant and properly admitted at trial. See State v. Roy, 681 So.2d 1230, 1242 (La.1996). In addition, the evidence amply supported the remaining aggravating factors returned by the jury.

Proportionality
Although the federal Constitution does not require a proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 710 (La.1990). This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 7 (La.1979).
As noted above, the valid aggravating circumstances in the murders of Tangie and Devyn Thompson and Andre White were that the offense was committed during the course of an attempted armed robbery or aggravated burglary, that the offense created a risk of harm to more than one person, and that the offender has previously been convicted of an unrelated murder; and, as to Devyn Thompson, the victim was under the age of twelve years. Juries in Orleans Parish have recommended the death penalty be imposed against thirty-eight defendants in the past twenty-three years, including the instant case. In ten of these cases the jury found at least two[5] of the aggravating circumstances that defendant's jury found as to the count involving the child, Devyn Thomson. In one other case, the jury found the aggravating circumstance that the victim was under the age of twelve. *1214 St. Sent. Rev. Mem., pp. 18-19. As to the counts involving Andre White and Tangie Thompson, in addition to the ten capital cases already noted above in which the jury found at least those two aggravating circumstances, twenty-five other capital juries found as an aggravating circumstance the perpetration or attempted perpetration of an enumerated felony. As to the remaining aggravating circumstance-that the offender was previously convicted of an unrelated murder, two capital juries have previously found this as an aggravating circumstance. Id. The cases are numerous, both in Orleans Parish and statewide, in which this Court has found the death sentence for similar armed robbery/murders to be proportionate. See, e.g., State v. Davis, 92-1623 (La.5/23/94), 637 So.2d 1012 (Caddo Parish); State v. Lindsey, 543 So.2d 886 (La. 1989) (Jefferson Parish); State v. Busby, 464 So.2d 262 (La.1985), cert. denied, 474 U.S. 873, 106 S.Ct. 196, 88 L.Ed.2d 165 (1985), sentence vacated, 538 So.2d 164 (La.1988) (Vernon Parish); State v. Knighton, 436 So.2d 1141 (La.1983) (Bossier Parish); State v. Taylor, 422 So.2d 109 (La. 1982) (Jefferson Parish). A comparison of the defendant's case with the above-referenced cases indicates that the death penalty as applied to the instant defendant is not disproportionate, considering the offender and the offenses.

DECREE
For the reasons assigned herein, the defendant's convictions and death sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under its prevailing rules, for rehearing of denial of certiorari; or (b) that court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev. Stat. 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent the defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed in the state courts.
AFFIRMED.
KNOLL, J., concurs in part and assigns reasons.
TRAYLOR, J., concurs for reasons assigned by Justice KNOLL.
KNOLL, J., Concurring.
Respectfully, I concur only as to assignment of error twelve in the penalty phase because I disagree, notwithstanding the holding in State v. Jackson, 608 So.2d 949 (La.1992), that the State is limited to "the evidence supporting a prior conviction to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." This restriction unduly limits the State's ability to show the character and propensities of the defendant at the penalty phase when the State is seeking a sentence of death. The limitation sanitizes a defendant's violent conduct and unnecessarily micro-manages the discretion of the trial court. Evidence of defendant's prior convictions of murder are clearly admissible in the penalty phase. What evidence the State uses to show the prior conviction should be left to the discretion of the trial court.
Allowing a witness or surviving victim to a prior murder or attempted murder to *1215 testify rather than a law enforcement officer involved with the investigation of the offense is arbitrary. It would appear that a witness or a surviving victim's testimony could more easily present the risk of shifting the jury's focus away from its primary function of determining the appropriate sentence for this offense and this offender. Moreover, this overlooks the trauma that a witness or surviving victim of a prior murder has suffered and the necessity of bringing closure to these life shattering events. It would be unnecessarily harsh to require them to testify years later when they have moved on with their lives when a law enforcement officer could serve the same purpose.
In conclusion, because I am not in accord with State v. Jackson, I would overrule it, finding such a limitation is arbitrary, it micro-manages the trial court's discretion, unduly limits the State's ability to show the character and propensity of the defendant at the penalty phase, and could unnecessarily work an undue harshness upon witnesses and surviving victims of prior murders. For these reasons, and further for the reasons given by Justice Cole in his dissent in part in Jackson, I concur in the result of assignment of error twelve in the penalty phase.
NOTES
[*] Retired Judge Philip C. Ciaccio, assigned as Associate Justice Pro Tempore, sitting for Associate Justice Harry T. Lemmon.
[1] The assignments of error not discussed in this opinion do not present reversible error and are governed by clearly established principles of law. They will be reviewed in an unpublished appendix that will comprise part of the record in this case.
[2] Trackling and Bannister were charged as co-defendants with Juan Smith in the instant crime. Having originally been charged with three counts of first degree murder, Robert Trackling entered into a plea agreement with the state on July 2, 1996, in which he pleaded guilty to the amended charges of three counts of manslaughter. Pursuant to the counseled agreement, Trackling agreed to cooperate and "testify truthfully when called as a witness in the case of State of Louisiana v. Juan Smith, et al, Case no. 378-343 D." See State's Exhibit 159.
[3] As discussed previously, in State v. Wessinger, 98-1234, pp. 27-28, 736 So.2d at 181, this Court ended the exemption of sentencing hearings in capital cases from the contemporaneous objection requirement, but, fully aware "that this holding affects the meting out of the most serious sanctions our society can impose," we explicitly made the contemporaneous objection rule applicable only "to the penalty phase of those trials that begin after this decision is rendered."
[4] The trial judge only allowed Penalty Phase Exhibits 2, 10, 20, and 21 to be shown to the jury.
[5] Heinousness and risk of death or great bodily harm to more than one person.