913 So.2d 788 (2005)
STATE of Louisiana
v.
John Dale ALLEN.
No. 2003-KA-2418.
Supreme Court of Louisiana.
June 29, 2005.
Rehearing Denied November 29, 2005.
*791 R. Neal Walker, Jelpi Pierre Picou, Jr., New Orleans, LA, David Laurence Koen, Counsel for Appellant.
Hon. Charles C. Foti, Jr., Attorney General, Hon. William R. Jones, District Attorney, Clifford Royce Strider, III, Assistant District Attorney, Counsel for Appellee.
KNOLL, Justice.
The victim, Shirley ("Elaine") Posey Oliver, 51 years of age, an owner and operator of the Riverside Live Bait and Tackle Shop located in the "Old Town" section of Coushatta, Louisiana, was found stabbed to death in her bait shop in Red River Parish on July 6, 1999. On September 7, 1999, a Red River Parish grand jury indicted defendant, John Dale Allen, also known as "Boogaloo," for the first-degree murder of Oliver, a violation of La.Rev. Stat. Ann. § 14:30.[1] On November 2, 2000, the State filed its notice of intent to seek the death penalty. On September 5, 2002, a unanimous jury found defendant guilty as charged. At the penalty phase of the trial, the jury unanimously returned a verdict of death finding an aggravating circumstance: the offender was engaged in the perpetration or attempted perpetration of armed robbery.
*792 Defendant now appeals his conviction and sentence raising 50 assignments of error variously consolidated into 20 arguments.[2] For the reasons set forth below, we affirm defendant's conviction for first-degree murder and sentence of death.

FACTS AND PROCEDURAL HISTORY
On July 6, 1999, Elaine Oliver was working alone in the bait shop[3] located at 123 Carroll Street toward the end of the Old Town[4] section of Coushatta. Sometime in the early afternoon, she left the store to purchase groceries from Carter's Bestway Grocery Store, leaving a handwritten sign on the front door of the bait shop indicating she would return in a few minutes. A Carter's Bestway Grocery receipt recovered at the crime scene indicated that Mrs. Oliver purchased her groceries at 2:42 p.m. At trial, Charles Friday, a Coushatta resident, who had known Mrs. Oliver for over thirty years, testified that he observed her driving on Carroll Street toward the bait shop at approximately 3:00 p.m.[5] Mr. Friday recalled the time because he was on his way to pick up his son from summer school, which always concluded for the day at 3:00 p.m.
Shortly after 3:00 p.m., Jason McCarthy and Robert Caskey, two fishermen, arrived at the store to purchase some shiners. Although the men noticed the sign on the front door, they decided to enter the store as there was another vehicle parked in front of the store and the door was cracked open. They assumed the attendant was simply in the restroom. As Robert Caskey proceeded down the aisles of the store perusing the fishing merchandise, he came upon the body of a woman lying face down on the floor. After alerting Jason McCarthy of his discovery, both men fled the store in an attempt to seek help. Upon exiting the building, they saw a woman standing in a yard across the street, but they were informed that her phone was not operating. They flagged down a motorist driving a pick up truck.
The driver of the truck, David Murray, was a Justice of the Peace. He stopped his vehicle upon seeing the two men, and after hearing what they had discovered, exited his vehicle and entered the store. Upon confirming what the two men had told him, Murray returned to his truck and called the Red River Sheriff's Department. Leaving the store, Murray noticed the cash register was open and the change drawer of the cash register was on the counter. The call was dispatched at approximately 3:48 p.m. Within minutes, Chief Charlie Adams and Officer Derrick Smith of the Coushatta Police Department arrived on the scene.
Both officers entered the store, and Chief Adams checked Mrs. Oliver's carotid pulse to determine if she was deceased. Prior to this, none of the witnesses had touched the body. The officers then *793 checked the interior of the store to ascertain whether the assailant was still on the premises. After sweeping the building and finding it empty, the officers exited the building and contacted the sheriff's office to call the coroner's office. The officers then secured the building by posting themselves on the outside and put up standard yellow crime-scene barrier tape.
During this time, Sheriff Buddy Huckabay and Detective Johnny Ray Norman of the Red River Parish Sheriff's Office arrived on the scene. Chief Adams escorted them into the store to view the body. Chief Adams testified that he did this because the Sheriff was the chief law enforcement officer of the parish and shared jurisdiction with the town of Coushatta. Further, the sheriff was a retired State Trooper, who was in law enforcement a lot longer than the chief and at one time was in the detective division of the State Police. At the Sheriff's suggestion, Chief Adams called in the State Police. At this time, it appears the Sheriff's Office ceased its involvement with the investigation and the investigation became a joint effort of the Coushatta Police Department and the State Police. During this time, the North Louisiana Crime Lab was also contacted.
Thereafter, Investigators Darrell Mills and Rob Scobee from the Louisiana State Police Troop G in Shreveport arrived on the scene, and then around 6:20 p.m., the Crime Lab team consisting of Connie Brown, the forensic DNA analyst, and Richard Begley, the firearm section supervisor of the Crime Lab and a fingerprint and tool mark analyst, arrived.
At the request of Detective Mills, Chief Adams appointed Officer Smith to serve as the evidence custodian and liaison between the Coushatta Police Department and the State Police. The evidence was collected at the scene at the direction of Connie Brown and Richard Begley and maintained by Officer Smith until transfer to the Crime Lab. This evidence included several blood swabs, a fish basket, a bait rack upon which the body of the victim rested, the cash register, which was found opened, and the cash drawer with the spring arms in the upright position. Also included in the evidence was the receipt from Carter's Bestway Grocery dated July 6, 1999 at 2:42 p.m. taken from the victim's purse and a receipt taken from the cash register tape, which had to be removed from the machine at the scene, indicating that the register was last opened on July 6, 1999 at 3:07 p.m.[6]
Around dusk that evening, Tommy Russell approached Chief Adams and informed him that he had overheard someone talking about committing this crime. Mr. Russell testified that he overheard a man known to him as Boogaloo tell John A. Allen that he had stabbed somebody over at the bridge. He further testified he heard this statement as he was exiting Bam's Drive-in Washateria and that both men, who were sitting on a bench outside the washateria, appeared intoxicated. Mr. Russell then explained that he went to Old Town to check into it and to see whether it was true. At the Chief's instruction, Mr. Russell repeated this statement to the State Police. In his statement to Detective Mills, Mr. Russell explained he heard Boogaloo "bragging about he went in there and stabbed the lady and got over $300, and something dollars."[7]
Through the testimony of Edna Brimer, who occasionally worked the register at *794 the bait shop, it was revealed Mrs. Oliver tried not to keep more than $50 in the register at all times during the hours of operation. When she had more than $50 in the register, she would take the money out and put it in a bank bag. She would then place the bank bag in the bottom drawer of the desk. Mrs. Brimer also testified as to the procedure Mrs. Oliver would follow if she had to leave the store during the day. Mrs. Oliver would close up the store and lock it. She would take the cash out of the register and put the cash back in when she returned. Moreover, when Mrs. Oliver closed up and took all the money out of the register, she would put the spring arms that hold the dollar bills in place back down and push the drawer in. Officer Smith testified when the cash register was checked at the scene, the cash register tape was sticking out of the machine and testimony at trial revealed the cash register was open and the cash drawer was found on the counter.
Within the next day, the State Police also received information from Carlton Solton, Jr., a juvenile 13 years old, who was arrested for armed robbery of the Kwik Pantry in Coushatta, committed on July 5, 1999. He stated that after the armed robbery of the Kwik Pantry, Boogaloo had discussed with him other possible sites or targets for future armed robberies, which included a nursing home and the bait store in Old Town. Solton understood the store to mean the bait shop. Solton also implicated Boogaloo in the armed robbery of the Kwik Pantry.[8]
With this information, the Coushatta Police Department obtained a search warrant authorizing a search at 1824 Abney Street, the residence of John D. Allen, and an arrest warrant for John D. Allen in conjunction with the armed robbery of the Kwik Pantry. The warrants were obtained from Judge Douglas Allen of the Eighth Judicial District in Winn Parish on July 7, 1999. A second "anticipatory" search warrant was also obtained at this time in conjunction with the Oliver homicide. The officer who obtained the warrants, Officer Smith, indicated that Judge Allen told him to sign the affidavit for the second search warrant as if the officers had already executed the first search warrant.
Late in the evening on July 7, 1999, around 11:20 p.m., the Coushatta Police Department accompanied by a Minden SWAT team executed the warrants at 1824 Abney Street. The officers arrested John D. Allen at the residence. Incident to this arrest, the officers conducted a pat down search of the defendant, and for the officers' safety, Officer Smith confiscated a pair of knee high black rubber boots which the defendant was wearing at the time of his arrest. Officer Smith took these boots into evidence as there appeared to have blood on them.
Upon receiving the boots at the Crime Lab the next day, July 8, 1999, Connie Brown extracted two swabs of a substance suspected to be blood spatter. One swab was taken from the outside of the boot and the other swab was taken from the inside of the boot. DNA extractions from the swab taken from the inside of the boot revealed the substance was blood consistent with the blood taken from the victim. Ms. Brown testified that statistically there was a 1 in 404 quadrillion probability of finding the same DNA profile from another Caucasian other than Shirley Oliver. Connie Brown, who was also admitted as an expert on blood spatter or blood in flight, testified the blood spatter on the *795 boots was consistent with the blood spatter found at the crime scene on the fish basket and bait rack taken into evidence. Both the blood spatter on the boots and at the scene were of medium velocity spatter which characteristically is 1/8 of an inch in size and travels in motion only a very short distance. Also, Ms. Brown testified there was no evidence the blood at the scene was transferred by foot or footwear.
During the investigation, it came to light the defendant was seen in the area of the crime scene around 3:00 p.m. on the day of the murder by both Jesse Lee Hendricks and his mother Dorothy Hendricks from the window of Jesse Hendricks's bedroom in his house located on Abney Street. Jesse Hendricks testified he saw John D. Allen coming from Carroll Street walking towards the defendant's home on Abney Street. At the time defendant was wearing knee high black rubber boots with the pant legs of his blue jeans tucked into them. Both Dorothy and Jesse Hendricks testified they spoke with defendant and that defendant inquired about the whereabouts of his cousin, Peggy Sue Allen, the fiancee of Jesse Hendricks who resided with the Hendricks. The defendant instructed Jesse Hendricks to warn Peggy Sue to stay away from those stores in Old Town. Jesse Hendricks testified that the bait shop was the only store in Old Town. Both witnesses testified they recalled the time because the Montell Williams Show was just starting.
Dr. George McCormick performed the post-mortem examination of Mrs. Oliver on July 8, 1999.[9] Dr. McCormick testified *796 that Mrs. Oliver "died from blood loss from a large number of stabbing and cutting wounds."[10] The autopsy showed 21 stabbing and cutting wounds to the victim. Each wound was significant, and the assault was described by Dr. McCormick as overkill.
The relevant amended bill of indictment stated that John Dale Allen committed "First Degree Murder of Elaine Posey Oliver by intentionally killing Elaine Posey Oliver with a knife while engaged in an armed robbery of Riverside Live Bait and Tackle at 123 Carroll St., Coushatta, LA., in violation of R.S. 14:30(A)(1)."[11] Defendant was arraigned on September 22, 1999, and entered a plea of not guilty.
Thereafter, the State and the defense filed reciprocal discovery motions. The district court held hearings on various pretrial motions on September 24, 2001. On December 6, 2001, the district court found the "anticipatory" search warrant issued on July 7, 1999, pertaining to the Oliver homicide, invalid,[12] suppressing the evidence seized pursuant to the "anticipatory" search warrant.[13] The district court did *797 not suppress the disputed evidence, a pair of knee high black rubber boots, along with the other evidence seized pursuant to the homicide search warrant because, "[b]ased on the fact that there was a valid search warrant being executed and a search incident to a lawful arrest [for the armed robbery of the Kwik Pantry on July 5, 1999.]":
Even if both search warrants at issue were found to be invalid, the state claims the police had a valid arrest warrant. The boots were seized while the police were securing the defendant. When a valid arrest occurs, the arresting officer may search the arrestee without a warrant for the limited purpose of disarming him and retrieving evidence from his person which might otherwise be concealed or destroyed. The scope of this search includes the area within the immediate control of the person arrested. Therefore, this exception to the warrant requirement would apply.[14]
In his ruling, the judge relied upon Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), reh'g denied, 396 U.S. 869, 90 S.Ct. 36, 24 L.Ed.2d 124 (1969).
Jury selection began on March 4, 2002, in Red River Parish, but because of the publicity of the crime, the attorneys were not able to choose a jury. Defense counsel filed a motion for change of venue, which the State joined, and the district court granted. Jury selection resumed on August 26, 2002, in Jackson Parish, Louisiana, with Judge Lewis O. Sams, ad hoc, presiding. A panel of twelve jurors and two alternates was chosen.
Trial commenced on September 2, 2002. On September 5, 2002, the jury retired for deliberations at 5:40 p.m. At 6:10 p.m., the jury notified the court they had reached a verdict.[15] The jury returned a verdict of guilty as charged of first-degree murder. The penalty phase commenced on the following day, and the jury unanimously returned a sentence of death, having found the aggravating circumstance that the offender was engaged in the perpetration or attempted perpetration of armed robbery. Thereafter the judge imposed the sentence of death in accordance with the jury's verdict.

LAW AND ANALYSIS
The defendant filed fifty assignments of error. Of these, two merit discussion in the published opinion and are addressed under headings designating the primary procedural stage implicated; the others are discussed in an unpublished appendix.

Voir Dire

Batson Claims

(Assignments 17-22)
Defendant argues that five of the state's peremptory challenges were made on the basis of race and the prosecutor repeatedly misrepresented the record and gave other pretextual reasons for striking African-American prospective jurors, requiring that his conviction and death sentence be reversed. Defendant specifically points to five peremptory challenges exercised by the State against African-American jurors: Faron Taylor, Freddie Moore, Rosa McNeal, Lisa Caldwell, and Franklin Williams.
*798 In Batson v. Kentucky, 476 U.S. 79, 88-89, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the United States Supreme Court held that the Equal Protection Clause forbids the use of peremptory strikes to challenge potential jurors solely on account of race or the assumption that members of a certain race will be unable to impartially consider the case before them. Batson, 476 U.S. at 89, 106 S.Ct. 1712. The Court concluded that such discriminatory practices in the use of peremptory challenges denies the defendant equal protection of law and unconstitutionally discriminates against the potential jurors in violation of the Fourteenth Amendment. Id. at 88-89, 106 S.Ct. 1712. Accordingly, the Court established a three-part framework to be employed in evaluating an equal protection challenge to a prosecutor's use of a peremptory strike. Id. at 89, 106 S.Ct. 1712.
First, the defendant must make a prima facie showing of discrimination in the prosecutor's use of the strike. If the defendant is unable to make out a prima facie case of racial discrimination, then the Batson challenge fails and it is not necessary for the prosecutor to articulate "race-neutral" explanations for his strikes. State v. Green, 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 287-88. Once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995), reh'g denied, 515 U.S. 1170, 115 S.Ct. 2635, 132 L.Ed.2d 874 (1995). The second step of this process does not demand an explanation that is persuasive, or even plausible. Rather, the issue is the facial validity of the prosecutor's explanation. "Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Hernandez v. New York, 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality opinion). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination. Purkett, 514 U.S. at 767, 115 S.Ct. 1769; Hernandez, 500 U.S. at 358-59, 111 S.Ct. 1859; Batson, 476 U.S. at 96-98, 106 S.Ct. 1712.
Moreover, "[o]nce a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot." Hernandez, 500 U.S. at 359, 111 S.Ct. 1859. Additionally, a reviewing court owes the district judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. Id. at 364, 111 S.Ct. 1859.
The combination of factors needed to establish a prima facie case are: (1) the defendant must demonstrate that the prosecutor's challenge was directed at a member of a cognizable group; (2) the defendant must then show the challenge was peremptory rather than for cause; and (3) finally, the defendant must show circumstances sufficient to raise an inference that the prosecutor struck the venire person on account of being a member of that cognizable group. Batson, 476 U.S. at 96, 106 S.Ct. 1712. The Batson court also noted that relevant facts or circumstantial evidence of discriminatory intent include proof of disparate impact and a "pattern" of strikes against jurors, as well as, questions and statements made during voir dire. Id. at 96-97, 106 S.Ct. 1712.
In State v. Green, 94-0887, p. 24 (La.5/22/95), 655 So.2d 272, 287, this court held that the sole focus of the Batson *799 inquiry is upon the intent of the prosecutor at the time he exercised his peremptory strikes. The court went on to outline several factors that could lead to a finding that a prima facie case has been made pursuant to Batson:
The defendant may offer any facts relevant to the question of the prosecutor's discriminatory intent to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes by a prosecutor against members of a suspect class, statements or actions of the prosecutor which support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally empaneled, and any other disparate impact upon the suspect class which is alleged to be the victim of purposeful discrimination.
Id.
Recently in Johnson v. California, (2005), 545 U.S. ___, 125 S.Ct. 2410, 162 L.Ed.2d 129, the United States Supreme Court explained the Court "did not intend the first step to be so onerous that a defendant would have to persuade the judge  on the basis of all the facts, some of which are impossible for the defendant to know with certainty  that the challenge was more likely than not the product of purposeful discrimination. Instead, a defendant satisfies the requirements of Batson's first step by producing evidence sufficient to permit the trial judge to draw an inference that discrimination has occurred." Johnson v. California, (2005), 545 U.S. at ___, 125 S.Ct. at 2413 (finding as an inappropriate yardstick by which to measure the sufficiency of a prima facie case of purposeful discrimination California's "more likely than not" standard and reversing defendant's conviction because the permissible inferences of discrimination, which caused the district judge to comment that the case was "close" and the California Supreme Court to note its suspicion that all three remaining black jurors were removed, resulting in an all white jury, were sufficient to establish a prima facie case). Nevertheless, the Batson challenge must fail if the trial court finds the defendant fails to make out a prima facie case in the initial step of the Batson analysis.
The jury seated in the instant case consisted of: nine white jurors and three African-American jurors; seven males and five females. The alternative jurors were both white, one male and one female. Towards the end of voir dire, the defense made one Batson challenge.[16] At the time the defense lodged the challenge, nine[17] jurors had been chosen, three of whom were African-Americans. In total, the state exercised ten peremptory challenges. It excused five white jurors and five African-American jurors. The defense exercised nine peremptory challenges, all against white jurors.[18]
*800 The colloquy of the defense's Batson challenge shows:
MR. CLARK [for defense]:
Your Honor, at this time we are going to issue a Batson(?) Challenge to this. I think this makes five minority members of the panel that have been eliminated. Certainly Ms. Caldwell had absolutely no responses ... I don't think she was even asked a question during this round of questioning. Other than the general questions that were asked of everyone.
THE COURT:
Is it four or five?
MR. STRIDER [for prosecution]:
Your Honor, I can tell you, we have used ten challenges, five on African Americans and five on caucasians.
THE COURT:
Do you want to make a case as far [sic] as if a Prima Facie case has been proven as far [sic] as a pattern? Do you want to do that first, isn't that the proper procedure?
MR. STRIDER:
Yes, Your Honor.
THE COURT:
Is that the only argument you have, as far [sic] as just the mere number?
MR. CLARK:
You Honor, I think for the current challenges, both Ms. Caldwell and Mr. Williams. Mr. Williams had the opportunity to be questioned in private. He told the State his feelings, and the State did not ask for a challenge for cause. The man said "Look, I just wanted to share it with you, I can view the evidence, I can render a judgment on what I see and hear." It's the same thing everybody else has said. And that the only possible reasons at this point, we are eliminating all but, I believe, two minority members from this panel.
MR. STRIDER:
You Honor, obviously, under the latest cases involving Batson Challenges, it's a three-step process. First there has to be a Prima Facie Case proven. Once the Court determines a Prima Facie case, and only if the Court determines a Prima Facie Case, we have to offer ... reasons for the exemptions. Your Honor, so far we have issued ten challenges. Five of those have been of caucasians, five of those have been African-Americans. Three African Americans sit on this jury, right as it's composed right now. We have nine people and one third of them are African Americans. I don't believe that there has been a sufficient Prima Facie Case shown. The numbers don't show that. Mr. Clark argues the merits of the exercise of our peremptory challenges. But that is not where we are yet. First there has to be a Prima Facie Case shown. We would argue that no Prima Facie Case has been shown. We have accepted three African Americans.
MR. CLARK:
Your Honor, if you look at it from that standpoint, there are eight African Americans that have had the opportunity to be on this jury. And out of that group, then, more than 50 percent of the African Americans tendered for acceptance for this jury have been excluded. And I believe *801 that does rise to the level to take us to the next step of having to show the race/neutral reasons. The State has used 50 percent of its challenges to eliminate minority members from the panel.
MR. STRIDER:
If that's the case, your Honor, the Defense has used 100 percent of theirs to exercise on Caucasians. Therefore, he is arguing that he is in violation of Batson. I mean, I don't see how that works.
THE COURT:
Are you alleging a Prime Facie Case on that, is that what you are doing?
MR. STRIDER:
That's what he is saying, he is admitting that there is a Prima Facie Case. I don't think that ... I believe, your Honor, if you look at the questions that were asked and as an example.... Mr. Williams, this is a peremptory challenge. [sic] it is ours to give and use any way we want to as long as we don't do it in a racially or discriminatory manner. And Mr. Clark argues that Mr. Williams was just like everyone else. I beg to differ. Mr. Williams was argumentative, both in the first part and ... he wasn't as bad this time as he was the first time. But if you remember, he sat up there in that corner and argued with me continually.
(COUNSEL APPROACH THE BENCH)
THE COURT:
You said how many?
MR. CLARK:
50 percent of the State's challenges have been exercised against five of the eight minority members on this panel.
THE COURT:
You are saying five of eight minority members were challenged by the State?
MR. CLARK:
That's correct. There were eight minority persons so far on the panel that were subject to being selected on this jury. Five of them, which is about 62 ½ percent, have now been excluded by peremptory challenges by the State. And yet, those five challenges equate to 50 percent of the challenges the State has actually used.
THE COURT:
What is the percentage on the non-minority members, do you know how many of those? They have exercised five challenges on how many ... how many non-minority members have been in the panel that you could have exercised them on?
MR. STRIDER:
There are eight members of the panel right now. Eight members have been accepted. Three of those are African Americans, five are Caucasians. We have exercised five peremptory challenges on African Americans, five on Caucasians. So it's five and five.
THE COURT:
Based on the situation just as a pure numbers game, I feel like a Prima Facie showing hasn't been made. Although at the sidebar we indicated I would allow the State to proffer evidence of racially/neutral reasons on the members that were excluded.
MR. STRIDER:
Thank you. The State would also suggest that based on the voir dire and based on the answers given, that there is no ... there has been no racially/neutral reason proven that way, either, in any way. But any, the State appreciates you giving us the *802 opportunity to put our racial/neutral reasons on the record. For the record, for purposes of appeal....
At this point, the State proffered its non-racial reasons for its peremptory strikes of all five African-American jurors.
Although the district court ruled that a prima facie case had not been established, defendant asserts that the State's proffer of reasons for the peremptory strikes mooted the preliminary issue of whether the defense had satisfied its burden at the first stage of the Batson inquiry. The defense relies upon the United States Supreme Court holding in Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991), in which the Court stated: "Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant had made a prima facie showing becomes moot."
We find the defendant's reliance upon the rule set forth by the United States Supreme Court in Hernandez is misplaced. In this case, it is obvious from the district court's ruling that the defense's Batson challenge had already failed when the State proffered its reasons for appeal purposes only, because the court clearly found no discernable pattern of discriminatory intent demonstrated. Therefore, the defendant's Batson challenge failed at step one of the analysis, thus the burden never shifted to the prosecution to explain the racial exclusion.
The court clearly stated the defense failed to make a prima facie showing of discriminatory intent, and also clearly evident is the explanation that the race-neutral reasons were admitted into the record for appeal purposes only. The court did not proceed beyond step one of the Batson analysis, having found the defendant failed to carry its burden of establishing a prima facie showing of discriminatory intent and effectively ending the Batson challenge. The burden of proof never shifted to the prosecution. The challenge never went beyond step one, never reached step two, and definitely never proceeded to step three. Thus, the rule of Hernandez is inapplicable because the district court did not rule "on the ultimate question of intentional discrimination," i.e., step three, having found the Batson challenge had failed for lack of a prima facie showing of discriminatory intent in the first step of the analysis.
Therefore, the appropriate inquiry before this Court is whether the district court committed clear error in finding the defendant failed to make a prima facie showing of discriminatory intent in the State's exercise of its peremptory challenges. Evaluating the arguments, particularly the statistical data, i.e., the use of fifty percent of the State's peremptory strikes to strike African-American jurors as advanced by the defense, we do not find the district court abused its discretion as our review of the challenge and voir dire record demonstrate defendant has not produced sufficient evidence to allow us or the district judge to draw any inferences of discrimination sufficient to establish a prima facie case. Moreover, we do not find that the defendant's argument that the State through the exercise of its five peremptory challenges against the African-American jurors effectively excluded "about 62 ½ percent" of the eight minority persons present on the panels demonstrates a discernable pattern of discriminatory intent or sufficient to rise to the level of discriminatory intent found in Miller-El v. Dretke, (2005), 545 U.S. ___, 125 S.Ct. 2317, 162 L.Ed.2d 196 (finding discriminatory intent because (1) State peremptorily struck ten of eleven eligible African-American jurors, i.e., excluding 91% of the eligible African-American venire members *803 (___ U.S. at ___, 125 S.Ct. at 2325); (2) State's reasons for exercising peremptory strikes against some African-American panel members appeared equally on point as to some white jurors who served (___ U.S. at ___ - ___, 125 S.Ct. at 2325-26); (3) State's shuffling of the venire panel (at least two of the State's jury shuffles make no sense except as efforts to delay consideration of African-American panelists to the end of the week, when they might not even be reached) (___ U.S. at ___, ___, 125 S.Ct. at 2332, 2339); (4) State's "enquiry into views on the death penalty" (53% of African-American panelist but only 3% of non-African-Americans were questioned with a graphic script meant to induce qualms about applying the death penalty) (___ U.S. at ___, ___, 125 S.Ct. at 2332, 2339); (5) State's questioning about minimum acceptable sentences (100% of African-Americans but only 27% of non-African-Americans were subjected to trick questions about minimum accepted penalties for murder) (___ U.S. at ___, ___, 125 S.Ct. at 2332, 2339); (6) widely known evidence of the general policy of the Dallas County District Attorney's Office to exclude African-American venire members from juries at the time Miller-El's jury was selected (Sparling Manual) (___ U.S. ___, ___, 125 S.Ct. at 2332, 2340)).
Notably, only had we found the district court erred in its ruling on the prima facie element would this Court evaluate the proffered reasons for the exercise of the prosecution's peremptory strikes. Because we discern no error, we need not address the State's proffered reasons. Accordingly, we find the defendant's Batson arguments lack merit.

Penalty Phase

Prior Conviction Evidence

(Assignments 40 and 41)
In these assignments of error, the defendant combines two issues related to the penalty phase arguments made by the State. First, he argues the jury was improperly exposed to the fact that the defendant was serving a life sentence for the Kwik Pantry armed robbery, and secondly, he complains the prosecutor improperly argued that the jury was not responsible for a death sentence. Importantly, no contemporaneous objection was lodged by defense counsel during the penalty phase as to these issues.
Sentencing hearings shall focus on the circumstances of the offense, the character and propensities of the offender, the victim, and the impact the crime has had on the victim, family members, friends, and associates. La.Code Crim. Proc. art. 905.2. The well-settled law of this state entitles the State to introduce evidence of a capital defendant's unrelated convictions at the penalty phase as reflective of his character and propensities. State v. Smith, 98-1417, p. 15 (La.6/29/01), 793 So.2d 1199, 1208, cert. denied, 535 U.S. 937, 122 S.Ct. 1317, 152 L.Ed.2d 226 (2002); see also, State v. Comeaux, 93-2729, p. 5-7 (La.7/1/97), 699 So.2d 16, 20, cert. denied, 522 U.S. 1150, 118 S.Ct. 1169, 140 L.Ed.2d 179 (1998). "However, as this Court has stated before, there can be a point when the sheer magnitude and detail of the evidence, although highly probative, impermissibly shifts the jury's focus away from its primary function of determining the appropriate sentence for this offense and this offender." Smith, 98-1417, p. 15; 793 So.2d at 1209; see also, Comeaux, 93-2729, p. 10-11; 699 So.2d at 22. Indeed, this Court in State v. Jackson, 608 So.2d 949, 954 (La.1992), specifically limited "the evidence supporting a prior conviction to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime." Smith, *804 98-1417, p. 15; 793 So.2d at 1209 (quoting Jackson, 608 So.2d at 954).
In his argument concerning the improper exposure of defendant's life sentence for the Kwik Pantry armed robbery, which occurred on July 5, 1999, defendant specifically complains of the testimony presented by State Police Detective Scobee, whose testimony concerned the statement Carlton Solton, Jr. made to him regarding the defendant's involvement in the Kwik Pantry robbery. Notably, during Detective Scobee's testimony, it was not mentioned the defendant was serving a life sentence for that robbery. Rather, the only time defendant's life sentence was mentioned in the penalty phase was during the presentation of defendant's unobjected-to prior convictions in the initial part of the penalty phase.[19] The State did not mention the defendant's life sentence in his penalty phase opening statement, through witness testimony, or in his two closing statements. However, defendant avers that Detective Scobee's testimony on the Kwik Pantry armed robbery was improper and inadmissible evidence because Detective Scobee was neither a victim nor a witness to the robbery.
Because the evidence introduced in the penalty phase supporting defendant's life sentence for armed robbery of the Kwik Pantry committed on July 5, 1999, was limited to the Bill of Information,[20] a document which certified the fact of conviction and sentence, the introduction of defendant's Kwik Pantry armed robbery conviction and life sentence was proper.
As to the testimony of Detective Scobee, the admittance of the officer's testimony during the penalty phase of the trial did technically violate the rule set out in Jackson. Detective Scobee was not a witness to or victim of the Kwik Pantry armed robbery; yet, his testimony included the hearsay statement of Carlton Solton Jr., defendant's co-perpetrator. See La.Code Evid. art. 801(C)("`Hearsay' is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted"). Detective Scobee testified that Mr. Solton conveyed to him that the defendant was a principal to the Kwik Pantry armed robbery. Mr. *805 Solton stated that the defendant "had instructed him [Solton] and gave him items and instructions on how to arm rob the Kwik Pantry."[21] The defendant gave Mr. Solton a ski mask, sunglasses, a silver knife, some oversized shirts, and white powder to use to make his skin color appear white. The defendant instructed Mr. Solton to enter the store and hide until the clerk was alone, and then at that time to rush in and jump over the counter and rob the store. The most damning testimony Trooper Scobee gave was that the defendant told Mr. Solton to kill the clerk if she gave him any "trouble." The defendant remained hidden in the woods while Mr. Solton committed the robbery. When Mr. Solton returned to the defendant, the defendant asked if he had "cut the woman," and Mr. Solton lied and said, "Yes." The defendant seemingly appeared "pleased." Furthermore, the defendant discussed future targets, one of which was the bait and tackle store.
In its closing argument, the State cited numerous times Detective Scobee's testimony regarding Carlton Solton's statement, and argued that it revealed defendant's true character and propensities. In his first closing argument, the prosecutor argued:
13-year-old Carlton Solton, a young kid from this community has his whole future in front of him. He is told how to go commit an armed robbery at the Kwik Pantry. The Kwik Pantry that this individual [defendant] has robbed before. He recruits a 13-year-old kid to go commit an armed robbery. And what does he tell him? "If she resists, take this knife and kill her." That, ladies and gentlemen, is the character of that person that sits over there. You can look at his propensities, in that one short testimony. 13 years old. "If she resists, kill her. Put on this oversize[d] jacket," to change his appearance, to prevent blood spatter from being all over him, put on this ski mask but throw some powder on you face first so it will look like you are of a different race? What is this guy, Armed Robbery 101? Let's take the little kids from our community and give them knives, and turn them in to murderers ... That kid sits in jail today because of him. Oh, he committed the robbery, he went in there and did it. He is responsible for his actions. And he is paying for his actions. But what did you hear today? Trooper Scobee told you that he [Solton] was afraid of him [defendant]. Carlton was afraid of John Dale Allen.[22]
As the prosecutor reviewed the mitigating factors to be considered by the jurors, he reiterated how the defendant sought out Mr. Solton and recruited him and influenced him to commit the Kwik Pantry armed robbery. In his second closing argument, the prosecutor discussed the defendant's criminal accomplishments, and stated again how he recruited and led a 13-year-old boy to essentially follow the same lifestyle. Finally, at the end of his closing argument, the prosecutor emphasized how the defendant got a "13-year-old to be an armed robber and encourages him to be a murderer, while he is committing an armed robbery with a knife."[23]
Detective Scobee's testimony should not have been admitted as it does not fall under any of the hearsay exceptions. See La.Code Evid. arts. 803 & 804; La.Code Crim. Proc. art. 905.2. However, defense counsel did not object to either Detective Scobee's testimony or to the prosecutor's *806 closing argument with regards to Carlton Solton's statement.
In State v. Taylor, 93-2201, p. 6-7 (La.2/28/96), 669 So.2d 364, 368, cert. denied, 519 U.S. 860, 117 S.Ct. 162, 136 L.Ed.2d 106, reh'g denied, 519 U.S. 1023, 117 S.Ct. 546, 136 L.Ed.2d 429 (1996), we found that "[w]ith able counsel at the helm, most significant errors occurring during the guilt phase should be contemporaneously objected to as required by La.Code Crim.P. art. 841(A)," reinstating the contemporaneous objection requirement in the guilt phase of capital trials. We extended Taylor to the penalty phase of capital trials in State v. Wessinger, 98-1234, p. 19-20 (La.5/28/99), 736 So.2d 162, 180,[24]cert. denied, 528 U.S. 1050, 120 S.Ct. 589, 145 L.Ed.2d 489 (1999), reh'g denied, 528 U.S. 1145, 120 S.Ct. 1001, 145 L.Ed.2d 947 (2000), reasoning:
we first note that there are two related and equally sound policies behind the contemporaneous objection rule. First, the rule brings the error to the trial judge's attention and affords him an opportunity to correct it "before it infect[s] the entire proceeding." State v. Potter, 591 So.2d 1166, 1169 (La.1991); see also State v. Arvie, 505 So.2d 44 (La.1987); State v. Knapper, 458 So.2d 1284 (La. 1984). Second, the rule "is specifically designed to promote judicial efficiency by preventing a defendant from gambling for a favorable verdict, and then, upon conviction, resorting to appeal on errors which either could have been avoided or corrected at the time or should have put an immediate halt to the proceedings." Taylor, 669 So.2d at 368; see also Knapper, 458 So.2d at 1287, n. 3. We find that these policies are equally as applicable to the penalty phase of a capital trial as they are to the guilt phase. A contemporaneous objection to an error occurring during the penalty phase of a capital trial will either allow the trial judge to correct the error before it "infects" the entire penalty phase or, in the case of a serious error, allow the judge to immediately stop the proceedings and immediately give the defendant a new penalty phase, free of the error, rather than make the accused go through the entire, contaminated penalty phase, and then go through yet another penalty phase after appeal.
We further find that the Taylor rationale for applying the contemporaneous objection requirement to the guilt phase of a capital trial is equally valid in the penalty phase, as the able counsel that are now available to the criminal accused through the LIDB should have no problem recognizing and lodging contemporaneous objections to reversible errors.
Additionally, there are more than ample safeguards to assure that the failure of defense counsel to object to a reversible error will not condemn the defendant to an unjust execution. This court has an independent duty under article I, section 20 of the Louisiana Constitution of 1974, La.C.Cr.P. art. 905.9, and La. Sup.Ct.R. 28 to determine whether the sentence imposed is constitutionally excessive. This is done by carefully examining the record for evidence of passion, prejudice, or arbitrary factors that could have caused the death penalty to be imposed. In the event that an error that warranted reversal was not objected to contemporaneously in the trial court, that error will be discovered during our mandatory direct review. Further, the failure to object to a valid error may be the proper subject of a postconviction *807 claim of ineffective assistance of counsel.
Thus, both because all of the same policies that apply to requiring a contemporaneous objection in the guilt phase of a capital trial also apply to the penalty phase and because the rights of the accused are still protected regardless of the application of the contemporaneous objection rule, we hold that we will no longer consider alleged errors occurring in the penalty phase of a capital trial absent a contemporaneous objection. However, because we are mindful that this holding affects the meting out of the most serious sanction our society can impose, this holding will be strictly applied prospectively only. That is, we will only apply the contemporaneous objection rule to the penalty phase of those trials that begin after this decision is rendered. [Footnotes omitted]
In this case, the state was technically entitled to urge the substantive value of the statement. Even assuming that Carlton Solton's statement, via Detective Scobee's testimony, was hearsay, there were no objections to this evidence when it came before jurors or when the State argued the truth of the matter contained therein. In the ordinary case, hearsay evidence not objected to constitutes substantive evidence. State v. Lubrano, 563 So.2d 847, 849 (La.1990); State v. Allien, 366 So.2d 1308, 1311 (La.1978).
The defendant failed to object to these remarks, and therefore waived any error with respect to these comments. La. Code Crim. Proc. art. 841; State v. Wessinger, 98-1234, pp. 19-20, 736 So.2d at 180. This case was tried well after the decision in Wessinger, and counsel's failure to object contemporaneously waived review of the claimed errors on appeal unless the errors were so grave as to interject an arbitrary factor into the proceedings subject to this Court's Rule 28 review. Wessinger, 98-1234 at 20, 736 So.2d at 181.
"Arbitrary factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed `wantonly or freakishly' or for discriminatory reasons." Smith, 98-1417, p. 16; 793 So.2d at 1209, quoting State v. Thibodeaux, 98-1673, p. 14 (La.9/8/99), 750 So.2d 916, 928. The reasoning behind limiting the evidence regarding prior convictions during the penalty phase "to the document certifying the fact of conviction and to the testimony of the victim or of any eyewitness to the crime" is to allow the jury to consider the fact that the defendant had been previously convicted of a crime without shifting the jury's focus from its function of determining the appropriate sentence in the case at hand to a focus on the defendant's involvement in another unrelated crime. Smith, 98-1417, p. 17; 793 So.2d at 1209-10. "It is the shifting of the focus of the jury to an unrelated crime that creates the injection of an arbitrary factor, which explains why we have placed limitations on the evidence admissible to support a prior conviction." Id. at p. 17; at 1210.
Although technically in violation of Jackson, after reviewing the record, we are not able to say that the testimony and evidence presented by Detective Scobee injected an arbitrary factor into the jury deliberations. In the present case, the jury was properly aware of defendant's past convictions, including his Kwik Pantry armed robbery conviction and life sentence, because such evidence is relevant to his character and propensities. Additionally, Carlton Solton, Jr., could have been called to testify during the penalty phase about defendant's role in the Kwik Pantry *808 armed robbery, and his testimony would have been admissible and non-hearsay. That evidence, assuming he would testify in accord with Detective Scobee's account of his statements, would also have revealed defendant's character and propensities.[25] Most importantly, the jury found as the sole aggravating circumstance that the offender was engaged in the perpetration or attempted perpetration of armed robbery. The jury had just convicted the defendant of the murder of Elaine Oliver while the defendant was engaged in the armed robbery of the bait shop, and they were entitled, at least, to consider that the defendant had earlier been convicted of armed robbery. They were presented evidence in this case that showed the defendant repeatedly and brutally stabbed Elaine Oliver to death, inflicting 21 stabbing and cutting wounds, many of which were independently fatal. Additionally, the evidence in this case presented to the jury depicted this assault as an overkill.
Although it was error to illicit the testimony of Detective Scobee regarding the defendant's involvement in the unrelated Kwik Pantry armed robbery, we cannot say that such testimony undermines our confidence in the jury's death penalty verdict. Therefore, we find this assignment of error is without merit.
Also, in this argument, defendant contends that in the State's closing argument, the State diminished the jury's responsibility for sentencing defendant to death. The defendant complains of the following language:
He is responsible for this, not you ... You are not responsible for what he did. He is ... You are not here because you want to ... Those police officers are not here because they want to be. They are here because of what he did. Don't let anybody shift that responsibility. It's a matter of accepting responsibility. He must accept responsibility for his actions... He put you in this position. You are here because of him.[26]
As a general matter, the United States Supreme Court and this Court have held that arguments which diminish the jury's sense of responsibility for the verdict and sentencing recommendation introduce an arbitrary factor into the sentencing phase which may result in reversible error. Caldwell v. Mississippi, 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). When these comments are lengthy or objected to, this Court has found them to be reversible error. State v. Willie, 410 So.2d 1019, 1034-35 (La.1982), cert. denied, 465 U.S. 1051, 104 S.Ct. 1327, 79 L.Ed.2d 723 (1984). Nevertheless, when the remark was so brief or innocuous that it would not reasonably induce a juror to believe that his responsibility was lessened by appellate review, the death sentence has been affirmed. State v. Scales, 93-2003, p. 12-13 (La.5/22/95), 655 So.2d 1326, 1335, cert. denied, 516 U.S. 1050, 116 S.Ct. 716, 133 L.Ed.2d 670, reh'g denied, 516 U.S. 1142, 116 S.Ct. 977, 133 L.Ed.2d 897 (1996); State v. Deboue, 552 So.2d 355, 365 (La.1989)(trial court's comments regarding the defendant's right to appeal), cert. denied, 498 U.S. 881, 111 S.Ct. 215, 112 *809 L.Ed.2d 174, reh'g denied, 498 U.S. 993, 111 S.Ct. 541, 112 L.Ed.2d 550 (1990); State v. Knighton, 436 So.2d 1141, 1157-58 (La.1983), cert. denied, 465 U.S. 1051, 104 S.Ct. 1330, 79 L.Ed.2d 725 (1984). Also, closing arguments in criminal cases should be restricted to the evidence admitted, to the lack of evidence, to conclusions of fact that may be drawn therefrom, and to the law applicable to the case. La.Code Crim. Proc. art. 774.
Here, the state's comment was brief, unobjected to, and did not introduce an arbitrary factor into the defendant's sentencing. Instead, it emphasized that the defendant, by his actions, should be subject to the death penalty. Accordingly, the state's comment did not violate La.Code Crim. Proc. art. 774. See Deboue, 552 So.2d at 365; Knighton, 436 So.2d at 1157-58.

CAPITAL SENTENCE REVIEW
Under La.Code Crim. Proc. art. 905.9 and La. Sup.Ct. R. 28, this Court reviews every sentence of death imposed by Louisiana courts to determine if it is constitutionally excessive. In making this determination, the Court considers whether the jury imposed the sentence under the influence of passion, prejudice or other arbitrary factors; whether the evidence supports the jury's findings with respect to a statutory aggravating circumstance; and whether the sentence is disproportionate, considering both the offense and the offender.
In the present case, the district judge has filed the Uniform Capital Sentence Report ("UCSR") required by La. Sup.Ct. R. 28 § 3(a) and the Department of Public Safety and Correction submitted a Presentence Investigation Report ("PSI"). See La. Sup.Ct. R. 28 § 3(b). In addition, the State filed a Sentence Review Memorandum.
These documents indicate that defendant, John Dale Allen, is an African-American male, born on February 9, 1966, to the legal union of Willie Davis and John Dale Allen, Sr. The PSI indicates that his mother is still living and the status of his father is unknown. Defendant stated that he has not seen his real father in years. Defendant claimed to have two half-brothers and three half-sisters. At the penalty phase, defendant's younger sister, Rhonda Davis, testified that she was very close to him and that he would often look after her when they were younger. Davis further testified that she often saw defendant drinking alcohol.
The PSI indicates that defendant was 33 years old at the time he committed the murder, and he was residing in Coushatta, Louisiana. He was reared in Natchitoches, Louisiana, until he was five years old. He moved to Houston, Texas, until he was 15 years old, and then his family moved to Winnfield, Louisiana, where he resided till he was 18 years old. Defendant has no children and has never been married. His highest level of education is 10th grade high school. He apparently attended the Winn Parish Career Center until he was 15 years old. It was at this age that he began to skip school and drink heavily. He quit school after he was suspended on several occasions for fighting. He has a medium IQ, which ranges between 70 and 100.
According to the PSI and UCSR, defendant had very little legitimate employment history. He claimed that he has a disability, which is unspecified, and that he was unable to work, and that he collected SSI. This information was not verified.
Defendant's criminal record began when he was 17 years old. On January 19, 1984, he was charged in Winn Parish with nine counts of forgery, for which he was later *810 sentenced to nine years imprisonment at hard labor, suspended, with five years probation.
On July 17, 1984, he was charged with disturbing the peace, criminal damage to property and aggravated assault, but these charges were dismissed.
On August, 20, 1984, defendant was charged with and convicted on four counts of forgery, for which he was concurrently sentenced to three years at hard labor on each count.
On November 27, 1991, defendant was charged in Red River Parish with armed robbery, which was amended to first degree robbery, to which he pled guilty. He was sentenced to five years at hard labor without benefit of probation, parole or suspension of sentence.
On April 4, 1992, defendant was charged with simple escape, to which he was sentenced one year with the department of corrections, to be served with any other sentence.
On July 8, 1999, defendant was charged with armed robbery arising out of the Kwik Pantry incident in Coushetta. On October 25, 2000, he was sentenced to 99 years at hard labor without benefit. On December 13, 2000, he was sentenced to life imprisonment as a habitual offender.
Defendant did not testify at either the guilt phase or the penalty phase of his capital trial. The defense presented one witness at the penalty phase: Rhonda Davis. On September 26, 2002, the court imposed the sentence of death by lethal injection, as unanimously recommended by the jury.

Passion, Prejudice, and Other Arbitrary Factors
The first degree murder of Elaine Posey Oliver occurred on July 6, 1999, and the initial voir dire selection in Red River Parish commenced on March 4, 2002, some two and a half years after the crime was committed. Numerous prospective jurors indicated that they recalled hearing about the events at the time they occurred, and that they had been unduly influenced by newspaper, television, or radio reports. Defendant filed a motion to change venue, which was joined by the state. Pursuant to a court order, jury selection was transferred to Jackson Parish, and it began on August 26, 2002. After several days, a jury of twelve, with two alternates, was chosen, and the defendant's trial began on September 3, 2002.
Defendant is an African-American male, who was 33 years old at the time of his offense. The murder victim was Caucasian, who at the time she was killed was a 51-year-old married woman.
The defense urged that the State exercised its peremptory challenges discriminatorily to exclude minorities, especially African-Americans from the jury, in violation of Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). The district court never found a prima facie case of discrimination, and our review of the record reveals no prejudice is apparent.
Defendant raised the claim that the State's presentation of gruesome photographs of the victim inflamed the passions of the jury and caused him prejudice. As discussed in the appendix, no error is apparent in the district court's decision to admit a limited number of crime scene photographs depicting the remains of the victim. No prejudice is apparent in that ruling.
There is no indication in the record that the jury's determination was based on passion, prejudice, or any other arbitrary factor.

*811 Aggravating Circumstances

The State relied on one aggravating circumstance under La.Code Crim. Proc. art. 905.4(A) and the jury returned the verdict of death, agreeing that the circumstance was supported by the evidence: (1) the offender was engaged in the perpetration or attempted perpetration of an armed robbery. La.Code Crim. Proc. art. 905.4(A)(1); see Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560(1979). The aggravating circumstances relied upon by the State was fully supported by the evidence. Consequently, defendant's sentence of death is firmly grounded in the finding of this aggravating circumstance.

Proportionality
Although the federal Constitution does not require proportionality review, Pulley v. Harris, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), comparative proportionality review remains a relevant consideration in determining the issue of excessiveness in Louisiana. State v. Burrell, 561 So.2d 692, 712 (La.1990), cert. denied, 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 861 (1991).
This Court reviews death sentences to determine whether the sentence is disproportionate to the penalty imposed in other cases, considering both the offense and the offender. If the jury's recommendation of death is inconsistent with sentences imposed in similar cases in the same jurisdiction, an inference of arbitrariness arises. State v. Sonnier, 380 So.2d 1, 5 (La.1979).
The State's Sentence Review Memorandum reveals that since 1976, two other individuals in the Thirty-ninth Judicial District, which comprises Red River Parish, have been charged with capital murder. Neither of these defendants received the death penalty. Richard Scott McCoy, who murdered his ex-wife in front of their children, pled guilty to first-degree murder in exchange for a sentence of life imprisonment without benefit of parole, probation, or suspension of sentence.[27] Lynwood Hudson, an African-American male, killed John Snead, a Caucasian male, who was an acquaintance of his, arguably after Mr. Snead made unwanted sexual advances toward a third person, Deltheia Heard. Mr. Hudson was initially charged with first-degree murder, but pled guilty to the amended charge of manslaughter. He was sentenced to 40 years imprisonment at hard labor after a review of a PSI.
Given the inadequate data base in Red River Parish, a state-wide review of capital cases is appropriate. State v. Sepulvado, 93-2692, p. 18 (La.4/8/96), 672 So.2d 158, 170, cert. denied, 519 U.S. 934, 117 S.Ct. 310, 136 L.Ed.2d 227, reh'g denied, 519 U.S. 1035, 117 S.Ct. 600, 136 L.Ed.2d 527 (1996). That review shows that jurors often recommend death when a murder involves an armed robbery. "[C]onsidering the fact that this case is an armed robbery and the cases are legion in which this Court has affirmed capital sentences based primarily on the jury's finding that the defendant killed the victim in the course of an armed robbery, it is nearly impossible to conclude that the sentence of death is disproportionate in this case." State v. Frost, 97-1771, p. 26 (La.1998), 727 So.2d 417, 438, cert. denied, 528 U.S. 831, 120 S.Ct. 87, 145 L.Ed.2d 74 (1999).[28] Proportionality review should include all similar *812 first-degree murder prosecutions including those which resulted in non-capital verdicts and/or sentences. However, the relevant pool of capital sentences based in part or entirely on armed robbery murder is now so large that this defendant's sentence does not reflect the wanton and freakish infliction of capital punishment, no matter how large the relevant pool of similar non-capital cases.
It cannot be said that the death sentence in this case was unconstitutionally excessive and disproportionate, considering defendant stabbed the victim approximately 21 times with a knife during an armed robbery. Nothing in any of the post-trial documents filed pursuant to La. Sup.Ct. R. 28 warrants reversal of defendant's death sentence.

DECREE
For the reasons assigned herein, the defendant's conviction and sentence are affirmed. In the event this judgment becomes final on direct review when either: (1) the defendant fails to petition timely the United States Supreme Court for certiorari; or (2) that Court denies his petition for certiorari; and either (a) the defendant, having filed for and been denied certiorari, fails to petition the United States Supreme Court timely, under their prevailing rules, for rehearing of denial of certiorari; or (b) that Court denies his petition for rehearing, the trial judge shall, upon receiving notice from this Court under La.Code Crim. Proc. art. 923 of finality of direct appeal, and before signing the warrant of execution, as provided by La. Rev.Stat. Ann. § 15:567(B), immediately notify the Louisiana Indigent Defense Assistance Board and provide the Board with reasonable time in which: (1) to enroll counsel to represent defendant in any state post-conviction proceedings, if appropriate, pursuant to its authority under La.Rev.Stat. Ann. § 15:149.1; and (2) to litigate expeditiously the claims raised in that original application, if filed, in the state courts.
AFFIRMED.
JOHNSON, J., concurs in part, dissents in part, and assigns reasons.
JOHNSON, J., concurs in part, dissents in part and assigns reasons.
In my view, the majority has erred in subscribing to a narrow reading of Batson that essentially eviscerates the United States Supreme Court's original intent and undermines the Equal Protection rights of defendants and potential jurors. Batson does not require that a defendant prove a "pattern" of discriminatory strikes in order to prove a prima facie case, although the Batson Court did note that a "`pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination." Batson v. Kentucky, 476 U.S. 79, 97, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Batson clearly states that
`a consistent pattern of official racial discrimination' is not `a necessary predicate to a violation of the Equal Protection Clause. A single invidiously discriminatory governmental act' is not `immunized by the absence of such discrimination in the making of other comparable decisions [emphasis supplied].'
Batson, 476 U.S. at 95, 106 S.Ct. 1712 (citations omitted).
It is clear that a criminal defendant's equal protection rights are violated where the state exercises a peremptory challenge to exclude even one prospective juror on the basis of his or her race. Id. at 87, 106 S.Ct. 1712; State v. Myers, 99-1803 (La.4/11/00), 761 So.2d 498, 500; see also La.C.Cr. P. art. 795. Further, a peremptory *813 challenge issued on the basis of race is an infringement upon the prospective juror's right to equal protection. Batson, 476 U.S. at 89, 106 S.Ct. 1712.
Purposeful racial discrimination in the use of peremptory challenges affects not only the trial itself, but the perceived fairness of the judicial system as a whole. A single instance of race or gender discrimination during the jury selection process, which is not identified and corrected by the trial court, constitutes reversible error. Id. at 95-96, 106 S.Ct. 1712.
At issue is the voir dire responses of Ms. Freddie Mae Moore. Ms. Moore was questioned in Panel Four. As transcribed in the record, Ms. Moore's responses prove that the state had no objective support for the exercise of a preemptive strike. When questioned by the prosecutor, Ms. Moore expressed no reluctance to impose the death penalty.
Q: If you were selected on this jury and you thought it was appropriate, could you impose the death penalty?
A. Yes.
Q. Have you thought about this before?
A. Yes.
Further, when questioned by the defense attorney regarding her willingness to impose the death penalty, Ms. Moore's responses were consistent.
Q. Ms. Moore, you indicated yesterday that you have no opposition to the death penalty, is that correct?
A: That's correct.
Q And that you feel that if it were appropriate you could in fact vote to sentence someone to die?
A. Yes.
Q. But, again, none of this is to say what you believe is wrong, what you believe is more right than what anybody else believes, it just a matter of determining what someone believes. You also believe ... would you share with me what you feel about someone receiving a life sentence? Do you think it's a serious sentence?
A. Yes, I do.
Further, Ms. Moore did not express any moral or religious beliefs which would prevent her from sitting in judgment of the defendant; nor in deciding the appropriate sentence, whether life in prison or a death sentence.
Q. Has anybody, any one of you, had any close friends or relatives that have been the victim of a crime? Ms. Moore, do you have any relatives or close friends who have been the victim of a crime?
A. No.
Q Are you willing, if you become a juror on this case, to have the responsibility of helping protect the constitutional rights afforded to the defendant?
A. Yes.
Q That includes the right to the presumption of innocence, only to be removed if you believe that the evidence has shown you and you were convinced beyond a reasonable doubt that the defendant is guilty?
A. Yes.
Q. Nothing about those rights that the defendant has that would cause you to feel you were going against your personal morals or religious beliefs to help afford those rights?
A. No.
The majority has specifically distinguished the instant matter from the recent United States Supreme Court case Miller-El v. Dretke, (2005), 545 U.S. ___, 125 S.Ct. 2317, 162 L.Ed.2d 196. However, the Court in Miller-El went beyond the bare statistics of 91 percent exclusion of *814 blacks from the venire and considered the individual responses of black venire panelists who were excused where whites were not. Miller-El, 545 U.S. at ___, 125 S.Ct. at 2326. Here, Ms Moore's responses were consistent with the responses of several white venire members who were ultimately selected to serve on the panel. The trial court erred when it ruled: "Based on the situation as a pure numbers game, I feel like a prima facie showing hasn't been made." In short, the trial court limited its Batson inquiry to whether the defendant proved a pattern of discrimination, without considering Ms. Moore's individual responses or demeanor. In my view, the trial court committed reversible error in not finding that defendant had made a prima facie case as it applied to Ms. Moore.
Further, Hernandez v. New York is analogous to the instant matter, as the U.S. Supreme Court did not require both the prosecutor's race-neutral reasons and the trial court's ruling on the ultimate question of intentional discrimination as a prerequisite to review of a Batson challenge. Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). Under the facts present in Hernandez, the prosecutor defended his use of peremptory strikes without waiting for the trial court to rule on whether the defendant had made a prima facie showing of intentional discrimination. Hernandez, 500 U.S. at 359, 111 S.Ct. 1859. The Hernandez Court was explicitly unconcerned by the trial court's departure from the Batson framework. Id.
We explained in the context of employment discrimination litigation under Title VII of the Civil Rights Act of 1964 that "where the defendant has done everything that would be required of him if the plaintiff had properly made out a prima facie case, whether the plaintiff really did so is no longer relevant." (Citations omitted). The same principle applies under Batson. Once a prosecutor has offered a race-neutral explanation for the peremptory challenges and the trial court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether the defendant made a prima facie showing is moot [emphasis supplied].
Id.
In my view, the issue of whether defendant made a prima facie showing became irrelevant once the state proffered its race neutral explanations. In Miller-El, the exercise of a peremptory strike against a minority juror whose voir dire responses were consistent with other jurors who served on the panel was proof of intentional discrimination. For this reason, I would remand this matter back to the trial court for an evidentiary hearing as it relates to Ms. Moore.

II.
Further, I believe that the majority has erred in holding that the state's "technical" violation of State v. Jackson did not inject an arbitrary factor into the instant proceedings. State v. Jackson, 608 So.2d 949, 954 (La.1992). The majority admits that Trooper Scobee's hearsay testimony should not have been admitted, as he was neither a witness to nor a victim of the Kwik Pantry robbery. This Court has previously held that allowing a police officer to testify during the penalty phase regarding prior convictions violates Jackson. See State v. Smith, 793 So.2d at 1209 (citing State v. Williams, 96-1023 (La.1/21/98), 708 So.2d 703, 719). Jackson has been recognized as a "jurisprudential rule created to prevent the injection of arbitrary factors into sentencing." Williams, 708 So.2d at 719. Arbitrary *815 factors are those which are entirely irrelevant or so marginally relevant to the jury's function in the determination of sentence that the jury should not be exposed to these factors; otherwise, the death penalty may be imposed wantonly or freakishly. Smith, 793 So.2d at 1209 (citations omitted). "It is the shifting of the focus of the jury to an unrelated crime that creates the injection of an arbitrary factor, which explains why we have placed limitations on the evidence admissible to support a prior conviction." Id. at 1210.
After reviewing the record in this case, it is clear that the hearsay testimony presented by Trooper Scobee injected an arbitrary factor into the jury deliberations. Four witnesses testified during the penalty phase. Trooper Scobee, Linda Rawls, the victim's youngest child, and Jack Oliver, her husband, all testified for the state. Defendant's sister, Rhonda Davis, testified on his behalf. Of the nine pages of testimony introduced during the state's case in chief, four were dominated by Trooper Scobee's testimony regarding defendant's participation in the Kwik Pantry robbery. These details were allegedly relayed to him during an interview with Carlton Solton, Jr.[1]
In order to find that no arbitrary factor was injected into the proceedings, the majority has assumed that Solton would testify in accord with Detective Scobee's account of his interview. The majority relies upon the fact that Solton could have been called to testify as to these facts during the penalty phase and his testimony would have been admissible and non-hearsay. However, as the record stands, Solton was not questioned and therefore, we do not know what his testimony would have been on direct and cross-examination. Defendant was unable to cross-examine Solton and the jury was denied the opportunity to weigh the credibility of Solton's statements during the sentencing phase.
Trooper Scobee's hearsay testimony regarding the Kwik Pantry robbery was offered to show that it revealed defendant's true character and propensities. Such an attempt by the state satisfies the very definition of arbitrariness, as it shifted the jury's focus to the unrelated crime rather than the evidence properly before it. Here, the prosecutor exploited a police officer's improperly admitted hearsay testimony to obtain a death sentence. In my view, this Court can have no confidence in jury's verdict. Therefore, I would vacate defendant's death sentence and remand *816 this matter to the trial court for a new sentencing hearing.
As to affirming defendant's conviction, I concur with the majority.
NOTES
[1] On September 7, 1999, the grand jury indicted the defendant for first-degree murder in violation of La.Rev.Stat. Ann. § 14:30, and armed robbery in violation of La.Rev.Stat. Ann. § 14:64. Both charges were contained in the bill of indictment filed under docket number 87,280. Due to a question as to whether the charges could be filed under one indictment because first-degree murder requires a unanimous twelve person jury to render a verdict and armed robbery only requires ten of twelve jurors to agree to render a verdict, the State sought to amend the bill of indictment to charge defendant with the crime of first-degree murder under bill of indictment number 87,280 and with armed robbery under bill of indictment number 87,280-A. The amended bill of indictment number 87,280 was filed on September 13, 1999.
[2] This capital case comes before us as a direct appeal pursuant to the appellate jurisdiction granted by La. Const. Art. V, § 5(D).
[3] The bait shop was described by Officer Derrick Smith of the Coushatta Police Department as an old gas station, converted into a convenience-type store selling fishing tackle, bait, and whatnot. The gas islands were no longer in use. Trial testimony revealed that the bait shop was the only convenience-type store in Old Town. The only other commercial property was a flower shop and a funeral home.
[4] Old Town was described by Officer Derrick Smith of the Coushatta Police Department as "the part of town where the remainder of the old bridge property was before they tore the bridge down" and constructed the new bridge in a different location.
[5] In his statement to the police, Mr. Friday said he saw Mrs. Oliver at 14:45 hours.
[6] The receipt actually depicts the day as 99  07  06 and the time as 15:07. The amount indicated $0.00. See State Exhibit (Trial) # 10 A.
[7] R., V. 8, p. 1789, ll. 2-3.
[8] Solton, however, did not directly testify about Boogaloo's involvement in the Kwik Pantry armed robbery at the defendant's first-degree murder trial.
[9] He testified Mrs. Oliver died from blood loss from a large number of stabbing and cutting wounds, 21 of which were numbered and counted. A couple were not counted because they may have been continuations of other wounds, i.e., there was one cutting wound which had skips in it; it may have been one stroke that simply skipped and cut in two or three different places.

The first wound numbered was a stab wound to the left of the midline of the victim's back which went upward from her left and to her right and went through the lower lobe of the left lung. It was 3 ½ inches deep and fractured rib seven, requiring extensive force. The second wound went into the right upper back, went from her right to her left and from back to front at a downward angle of about 45 degrees. It went below the shoulder blade into the chest, hit the right lung, the sac around the heart called the pericardium, and the wall of the aorta. This wound was six inches deep and fatal, fractured rib three, requiring extensive force. Wound number three was again to the midline on the right side of the back and went downward from her right to her left and from back to front. It hit both the upper and lower lobes of the right lung, was six inches deep, and was also fatal. Wound number 4 again went downward from her right to her left at the same angle and went from back to front. It hit the lower lobe of the right lung and was two and a half inches deep. Wound number 5 went upward from her left to her right, and it went from back to front, breaking rib number ten just at the spine, which required considerable force. It hit both the upper and lower lobes of the left lung and was four inches deep. Any of these wounds by themselves could have been fatal without immediate surgery, but wound number two was the most severe of the five because it hit the aorta.
Wounds number six and seven were over to the side of the victim, slightly behind and below her right ear. Wound six, the top wound, went into the cervical spine itself and hit one of the discs between the spine. It was three and half inches deep and would require excessive force, probably more force than the breaking of the rib. Wound seven, the lower wound, actually cut the ligaments that hold the head to the top of the spine, so that the head would be mobile on the top of the spine. This wound was three inches deep. Although both wounds could have been fatal, wound number seven cut through the ligaments attaching her head causing her head to fall forward on the neck, and that would have pinched her spinal cord and killed her.
Wound number eight was to the right cheek and went through the cheek into the mouth and was an inch and a half deep, requiring moderate force. Wounds number nine, ten, eleven, and twelve were wounds that went into the right side and the front of her neck, but were not deep wounds. Wound nine was two inches deep, wound ten was an inch and a half deep, wound eleven was three inches deep, and wound twelve was only a half an inch deep. Wound thirteen was a slashing wound across the front of her throat, and then there were a couple of smaller slashing cuts that were not numbered, on the right shoulder where the neck attaches in such a line that they might be one cutting motion that went all the way across and simply skipped across the skin. The wound was less than half an inch deep and was described as a slashing wound requiring moderate force. None of these wounds were fatal.
Wounds six through twelve were all on the right side of the face, and Dr. McCormick testified if the assailant was right-handed, the assault would have been inflicted from behind, but if the assailant was left-handed, the assault would have been inflicted from the front. Wounds one through five were inflicted from the back.
The rest of the twenty-one wounds were cutting wounds on the hands and the arms and were described as defensive wounds, wounds a victim received while trying to ward off an attack. Wound number fourteen was a slashing wound to the right hand, number fifteen was a wound to the tip of the thumb, number sixteen was a cutting wound on the palm surface of her right thumb, number seventeen was a cut across the palm of her right hand, number eighteen was a cutting wound on the top of her left hand at the top of the index finger and number nineteen was a cutting wound on the top of her left thumb. Number twenty was a cutting wound across the palm of her left hand, which cut the tendons of the second and third fingers and number twenty-one was another cutting wound to the palm of her left hand. Dr. McCormick testified that wounds sixteen through twenty-one would have been inflicted when the victim with the assailant coming at her with the knife tried to grab it. Every one of those wounds would be painful. Dr. McCormick surmised that the victim repeatedly grabbed the blade of the knife to try to save her life.
Dr. McCormick also testified to an abrasion or scrape on the left side of Mrs. Oliver's forehead, which indicated a deep wound and hemorrhaging inside the skull and around the brain. This wound also indicated that the victim was semi-conscious, unconscious, or deceased when she hit the ground. Moreover, in his meeting with Detective Scobee and prosecutor Cliff Strider on August 3, 1999, Dr. McCormick described this assault as overkill and, at trial, agreed that this overkill could have resulted from the victim fighting for her life.
[10] R., V. 7, p. 1579, ll. 7-8.
[11] R., V. 1, p. 29.
[12] As the anticipatory search warrant was correctly invalidated, we pretermit any discussion of this anticipatory warrant.
[13] The return on the homicide search warrant revealed several items were seized pursuant to the warrant: one pair of black rubber boots, four kitchen knives, one black handle knife, and one glass pipe. See Exhibits, State Motion # 6: Warrant; Affidavit for Search Warrant; Return on Search Warrant. The return was also admitted into evidence in the guilt phase as Defense Exhibit # 1.
[14] R., V. 1, p. 182. (Citations omitted).
[15] See R., V. 8, pp. 1907-08, ll. 30-3. The minute entry of September 5, 2002 recorded the jury retired to deliberate at 5:40 p.m. and at 6:40 p.m. the jury returned to open court. R., V. 1, p. 25.
[16] See R., V. 8, pp. 1907-08, ll. 30-3.
[17] Our review of the record reveals nine jurors had been seated at the time the defense lodged its challenge. See R., V. 6, p. 1325-26, ll. 33-1 (court read 10 names; however, one juror is excused moments before the challenge, R., V. 6, p. 1353, l. 27). The State in its Batson arguments first states there were nine seated, R., V. 6, p. 1355, l. 14, but then states that eight jurors were selected, R., V. 6, p. 1357, l. 5. The record clearly supports the correct number was nine.
[18] Interestingly, the State issued a challenge against the defense for using all nine of its peremptory challenges against white jurors. Immediately after it issued its challenge, the state withdrew it, stating:

Simply because, your Honor, if there's going to be a mistrial, what can we do? We get to do this whole process again? We are satisfied with the jurors, but it [is] patently unfair that the Defense can violate these juror's rights, and we are the ones that get challenged. But we withdraw it because we have to try this case.
R., V. 6, p. 1360, ll. 20-26.
[19] The prosecution introduced by joint stipulation the following prior convictions of the defendant, John D. Allen, by the pertinent Bills of Information:

1. Nine counts of forgery, committed in September of 1983; convicted of all nine counts and sentences to nine years in the Department of Corrections on May 15, 1984. (Sentence suspended)(Winn Parish). R., V. 8, p. 1890, ll. 14-24.
2. Four counts of forgery, committed in January of 1984; convicted on January 16, 1984, and sentenced to three years in the Department of Corrections. (Winn Parish). R., V. 8, pp. 1890-91, ll. 28-1.
3. Aggravated battery, committed upon Charles Collins, with a knife on August 1, 1987; convicted on February 16, 1988, and sentenced to one year in the Department of Corrections. (Claiborne Parish). R., V. 8, p. 1891, ll. 5-12.
4. First-degree robbery of the Kwik Pantry, committed on October 14, 1991; convicted on May 14, 1992, and sentenced to five years at the Department of Corrections on June 17, 1992. (Red River Parish). R., V. 8, p. 1891, ll. 16-24.
5. Simple escape, committed on April 3, 1992; convicted on May 14, 1992, and sentenced to one year in the Department of Corrections on June 17, 1992. R., V. 8, pp. 1891-92, ll. 28-1.
6. Armed Robbery of the Kwik Pantry, committed on July 5, 1999, convicted on August 29, 2000, and sentenced to life imprisonment on December 12, 2000. R., V. 8, p. 1892, ll. 5-11.
[20] R., V. 8, p. 1892, ll. 5-11; see also, supra, note 17 (description of crime and conviction).
[21] R., V. 8, p. 1894, ll. 5-6.
[22] R., V. 8, p. 1909, ll. 11-34.
[23] R., V. 8, p. 1914, ll. 17-18.
[24] Statutorily superceded in part on other grounds by La.Code Crim. Proc. art. 905.2 as to victim impact testimony. See State v. Gomez, 00-0566 (La.1/17/01), 778 So.2d 549.
[25] Carlton Solton, Jr., did testify during the guilt phase, but he did not testify about the defendant's role in the Kwik Pantry armed robbery. He merely stated that he saw the defendant afterward and that the defendant said the bait shop would be a good future target. However, Solton did testify about the defendant's role in the Kwik Pantry armed robbery in accord with Detective Scobee's testimony in the September 24, 2001, hearing on the State's motion to use 404(B) evidence, evidence of other crimes, wrongs or acts by the defendant. R., Supp., pp. 59-49.
[26] R., V. 8, pp. 1912-16, ll. 33-4.
[27] The defendant rejected a similar deal offered by the state on February 28, 2002, i.e., a guilty plea to first degree murder in exchange for a life sentence. R., Supp., pp. 108-09.
[28] Superceded by statute in part on other grounds. See State v. Gomez, 00-0566 (La.1/17/01), 778 So.2d 549.
[1] It is significant that when Carlton Solton, Jr. testified during the guilt phase of defendant's trial, the state did not elicit any of the details given by Trooper Scobee during the sentencing hearing. During direct examination, the prosecutor and Solton exchanged the following:

Q: After committing that armed robbery on July 5, 1999, did you see John D. Allen, Jr.?
A: Yes, sir.
* * *
Q: After you committed that armed robbery did you talk to John D. Allen?
A: Yes, sir.
Q: At that time did Boogaloo know that you had committed the armed robbery of the Kwik Pantry?
A: Yes, sir.
Q: Did you and Boogaloo discuss any other possible sites or targets for future armed robberies?
A: Yes, sir.
Q: Tell us, if you would, what sites or locations you discussed.
A: The nursing home and the store in Old Town.
Q: The store in Old Town?
A: Yes, sir.
* * *
Q: When he mentioned that store in Old Town, what store did you think of?
A: The bait stand.